741 F.2d 1486
 35 Fair Empl.Prac.Cas. 1048,
35 Empl. Prac. Dec. P 34,615
Charles H. GRUBB, Plaintiff-Appellee, Cross-Appellant,
v.
W.A. FOOTE MEMORIAL HOSPITAL, INC., a Michigan corporation,
Defendant-Appellant, Cross-Appellee.
 Nos. 82-1879, 82-1888.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 24, 1984.
Decided Aug. 20, 1984.
 
 John H. Schomer, Dykema, Gossett, Spencer, Goodnow & Trigg, Edward M. Richters (argued), Jackson, Mich., for defendant-appellant, cross-appellee.
 Joseph C. Marshall III (argued), Dickerson, Wright, Moon, Van Dusen & Freeman, Robert P. Young, Detroit, Mich., for plaintiff-appellee, cross-appellant.
 Before ENGEL and WELLFORD, Circuit Judges, and WEICK, Senior Circuit Judge.
 WEICK, Senior Circuit Judge.
 
 
 1
 Defendant-Appellant W.A. Foote Memorial Hospital, Inc. (Hospital) appeals to this Court, and Plaintiff-Appellee Charles H. Grubb (Grubb) cross-appeals, from a judgment of the U.S. District Court for the Eastern District of Michigan, after a bench trial in an action brought by Grubb against Hospital under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000e to 2000e-17, the Civil Rights Act of 1870, 42 U.S.C. Sec. 1981, and the Age Discrimination in Employment Act, 29 U.S.C. Secs. 621-634, and (through the pendent jurisdiction of the court) brought under Michigan common law and the Elliott-Larsen Civil Rights Act, Mich.Comp.Laws Secs. 37.2101-.2804. Grubb filed this suit, after exhausting administrative remedies with the U.S. Equal Employment Opportunity Commission, U.S. Department of Labor, and Michigan Civil Rights Commission, alleging that the elimination of his position as assistant laundry director at the Hospital, and the consequent termination of his employment there, constituted race and age-based discrimination as well as a breach of an implied contract of employment under the doctrine of Toussaint v. Blue Cross & Blue Shield, 408 Mich. 579, 292 N.W.2d 880 (1980).
 
 
 2
 The District Court found in favor of Grubb on his claim of racial discrimination, but found for Hospital on Grubb's age discrimination and implied contract claims. 533 F.Supp. 671 (E.D.Mich.1981). The final judgment of the District Court awarded Grubb $57,689.60 in back pay, $1,560.00 in lost meal allowance, $19,758.59 in interest, $25,000.00 in damages for emotional distress, and attorneys fees of $42,227.66 plus interest. Hospital was also ordered to reinstate Grubb for the purposes of all fringe benefits, and to pay "front pay" until he is reinstated to the same or a comparable position at Hospital or he reaches the age of seventy. However, the court did not require Hospital to reinstate Grubb to his job immediately.
 
 
 3
 For the reasons hereafter stated, we reverse the judgment in favor of Grubb for racial discrimination, and affirm the judgment in favor of Hospital denying Grubb's age discrimination and breach of implied contract claims.
 
 I.
 
 4
 Grubb was born of a black mother and white father in River Creek, Virginia, on March 4, 1916. He obtained a seventh-grade education in the Virginia schools, but was unable to attend high school on account of his race. However, he later acquired a high school graduate equivalency certificate while in the U.S. Army during the Second World War.
 
 
 5
 After the war, Grubb and his wife relocated to the area around Jackson, Michigan, where they have since remained and raised a family of six children. In 1957, after working as a Yellow Cab Company mechanic for ten years, Grubb went to work at the Sisters of Mercy Hospital (Mercy Hospital), where he served initially as a laundry worker who picked up soiled linen from hospital rooms. Four years later, in 1961, he was promoted to laundry manager. Although fairly inexperienced in laundry administration when he began, Grubb took numerous non-credit courses in laundry and general management sciences at local colleges, and he was ultimately certified as proficient by the American Institute of Laundry, a professional trade society. His lifelong struggle to improve himself made him the focus of an article in the local newspaper during the late 1960's.[1]
 
 
 6
 Throughout his service at Mercy Hospital (and later at Defendant Foote Memorial), Grubb was respected for his competence and hard work, and always evaluated as average or better in his job performance.[2] Beginning in 1964, he was assisted by a laundry supervisor, Mrs. Rosella Fountain, a woman two years older than Grubb, who had worked in the laundry at Mercy Hospital since 1940. The two apparently worked well together, with Grubb having responsibility for the overall management of the laundry facility (including preparing the budget, ordering supplies, and maintaining quality control), while Mrs. Fountain directly supervised the laundry workers, occasionally helped with the laundry work herself, and performed employee scheduling.
 
 
 7
 In 1975, Defendant Foote Memorial purchased Mercy Hospital from the Sisters of Mercy. Effective September 1st of that year, Mercy became known as "Foote West" while the Defendant's original facility became known as "Foote East." The merger of the two institutions occasioned the consolidation of various services which had been performed at both hospitals, with a view toward eliminating redundancy and effecting cost savings. A committee was formed in December 1975 to study and make recommendations to Hospital's administration regarding consolidation of the laundries at the two facilities. Among the members of the committee were Grubb and Willard Carl (then aged 34 or 35), the manager of the laundry at Foote Memorial since 1973.
 
 
 8
 The committee's final report recommended that the two laundries be consolidated at one location, and that only one laundry manager and one assistant manager be retained. The supervisor position held by Mrs. Fountain (there had been no comparable position at Foote Memorial) was to be abolished upon consolidation. However, between September 1975 and March 1976, the two laundries continued to function as before--entirely separately under the direction of their respective managers. No action was taken to eliminate Mrs. Fountain's position.
 
 
 9
 There is no indication that the committee report was ever acted upon by Hospital administration; however, in March 1976, Mr. Carl was appointed Director of Laundry for both facilities, and Grubb was designated as assistant director.[3] For approximately one year after those appointments were made, Grubb continued to manage the laundry at Foote West, assisted by Mrs. Fountain as laundry supervisor, but Grubb was now required to report to Carl and follow his instructions.
 
 
 10
 In or about February 1977, Carl presented a proposed 1977-78 budget to his superior, Associate Hospital Administrator Harold Petke, in which he recommended elimination of the assistant director post (held by Grubb) and retention of the supervisor position (held by Mrs. Fountain) when the two laundries were physically consolidated into one facility at Foote East in the summer of 1977. When Petke (who had served as Grubb's immediate supervisor at Mercy Hospital) asked Carl about his reasons for abolishing Grubb's position, Carl replied that Mrs. Fountain was more cooperative, had longer years of laundry experience, and worked better with "the women" (the laundry workers) than Grubb, and that he needed a working supervisor who would be willing to "pitch in" occasionally and help with the laundering work. Carl told Petke that there "wasn't a place" for Grubb. (App. at 58).
 
 
 11
 According to the trial testimony of Petke and the Hospital's personnel director, Gerald Culhane, Carl was given no objective criteria on which to base his decision regarding which supervisory position to eliminate in the consolidation process. Although Culhane "assumed" that Carl applied Hospital's usual layoff practice--considering the affected employees' relative performance, potential and length of service--both Carl and Petke testified that they were unaware of any particular layoff policy, and Carl never considered placing Grubb in the supervisor job. Apparently Carl was given near-plenary authority over his department's budget, and his proposal was ratified as a matter of course by his superiors in Hospital's administration.
 
 
 12
 During the transition year from Carl's appointment as overall laundry director until the laundries were finally consolidated, there was apparent friction between Carl and Grubb. According to Grubb's later testimony, Carl began to deal directly with Mrs. Fountain (a white woman), and allegedly told Grubb that the supervisor would thenceforth report directly to him (Carl) since "[n]o black guy should be a boss over white women." (App. at 303). On another occasion, Carl apparently ordered Grubb to fire three minority (two black, one Hispanic) laundry employees before the Foote West laundry became unionized (the Foote East laundry had been unionized before the merger). According to Grubb, when he failed to follow that instruction, Carl said, "When are you going to fire those niggers?" (App. at 298).
 
 
 13
 At trial, Carl testified and denied making such racist remarks, and both Mrs. Fountain and Lurlene Osborne (one of the black women whom Carl wanted to fire) testified that they never heard Carl use racial epithets or saw him discriminate against minority employees. Although Mrs. Osborne acknowledged that Grubb had warned her about Carl's wish to fire the women, she said he did not tell her why. Up through the date of his termination, Grubb never reported these alleged racist remarks to anyone in Hospital's administration.
 
 
 14
 Grubb also testified that, on several occasions, Carl made comments about Grubb's allegedly poor health, suggesting it was time for him to retire. And on one occasion when the two men disagreed over the type of bed sheet to use, Carl allegedly remarked, "Well, I know you are old and set in your ways." (App. at 301). At that time, Grubb was 60 or 61 years old.
 
 
 15
 From February 1977 until July 1977, rumors began to spread that Grubb's position would be eliminated. These rumors reached him through subordinates and fellow employees. Although Carl informed Mrs. Fountain, as early as April of that year, that she would be retained at the new facility (and, at least by implication, that Grubb would not), he never formally advised Grubb about his intentions, nor could he explain at trial why he did not do so. Grubb, not having been told anything officially, and having been told by administrator Petke that Carl would have to have documented reasons for firing him, decided to wait and see what happened.
 
 
 16
 Finally, in July 1977, Grubb finished overseeing the transfer and disposition of the equipment from the laundry at Foote West, and reported to what he thought would be his new office at Foote East. Instead, he found that the office had been turned into a lunchroom. Soon after, Carl called Grubb into his office, handed him a termination notice, and said, "You can call this fired or whatever you please. You are done." (App. at 292).
 
 
 17
 Although Plaintiff then went to the personnel director, Culhane only processed his termination[4] and generally suggested that he might obtain work as a laundry truck driver for Hospital. Also, according to Grubb, Culhane told him that there was a grievance policy, leading ultimately to Hospital's president, but that it was "no use" going to the president about his situation. (App. at 293).
 
 II.
 
 18
 After Grubb was terminated from Hospital, he was unemployed for nearly two years until he took a similar job at the Jackson County Medical Care facility. He worked there from April 1979 until July of that year, when he voluntarily resigned (due to low pay and disagreement with his superiors' labor policies) and accepted early retirement under Social Security. In the meantime, he had filed charges with the federal and state agencies administering employment discrimination laws, raising for the first time his claim that his termination from Hospital was due to race and age discrimination. Subsequently, on February 16, 1979, he filed his complaint in the present action, seeking reinstatement at Hospital, injunctive and declaratory relief from further discrimination, back pay and benefits, $250,000.00 in punitive damages, and other compensatory relief (including damages for emotional pain and suffering).
 
 
 19
 The case came to trial, on June 2-8, 1981, before District Judge Patricia J. Boyle. During the five trial days, eight witnesses (including Grubb) testified, and a considerable volume of documentary materials was submitted to the court. Then, on October 30, 1981, the court filed an opinion and order granting judgment in favor of Grubb. Judge Boyle found that the manner in which Carl informed Grubb of the elimination of his job showed animus toward him, and that Carl's racially derogatory remarks, reported in Grubb's credited testimony, showed that the basis for that animus was Grubb's race. Although she did not find that Petke's and Culhane's acquiescence in Carl's decision was prompted by discriminatory motives, Judge Boyle held that Hospital violated Title VII, section 1981, and the Michigan civil rights act when it relied almost entirely on Carl's subjective (and unlawfully motivated) evaluation.
 
 
 20
 The court did not, however, find age discrimination to be present in this case, holding that "[t]he single remark regarding age [Carl's statement to Grubb that he was 'old and set in his ways'] ... does not persuade me that age was a causal factor in the action taken, particularly when considered with the fact that Ms. Fountain was approximately 63 years old at the time Mr. Carl selected her position for retention." 533 F.Supp. at 675. She also declined to extend the Michigan decision in Toussaint v. Blue Cross & Blue Shield, supra, to a situation involving the elimination of an employee's position rather than a discharge from a continuing position, and thus denied Grubb's state-law breach of contract claim.[5]
 
 
 21
 In subsequent unpublished orders, the District Court reduced the award of back pay by the amount Grubb would have earned had he not terminated his employment at the Jackson County facility,[6] and ruled that immediate reinstatement was inappropriate since it could result in Mrs. Fountain's displacement and thus "engender hostility not conducive" to voluntary compliance with anti-discrimination laws. (App. at 540). After final judgment was entered by the court on August 30, 1982, Judge Boyle denied Grubb's motion for immediate reinstatement,[7] and denied successive defense motions for reopening of, or relief from, the judgment.
 
 
 22
 Hospital appealed from the final judgment in favor of Grubb, and Grubb cross-appealed from the court's denial of his age discrimination and contract claims, as well as the reduction of his back pay award and denial of punitive damages. By order entered February 18, 1983, the monetary aspects of the judgment were stayed by the District Court pending this appeal.
 
 III.
 
 23
 We come first to the District Court's holding that Hospital engaged in unlawful racial discrimination by permitting the elimination of Grubb's job based on Willard Carl's racially-biased recommendation. After a review of the entire record in this case, this Court must conclude that the finding was not supported by substantial evidence and is clearly erroneous.
 
 A.
 
 24
 As this is a case alleging racially discriminatory treatment, we should apply the basic allocation of burdens of proof set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under those decisions, the Title VII plaintiff must first prove, by a preponderance of the evidence, a prima facie case of discrimination.[8] Then, if the prima facie case is shown, the defendant must articulate, through admissible evidence, a legitimate, nondiscriminatory reason for the action taken. Finally, if the defendant carries this burden of production, the plaintiff must then prove, by a preponderance of the evidence, that the articulated reason was pretextual and not the true reason, either by showing that a discriminatory reason was the more likely motivation, or by showing that the articulated reason is unworthy of belief. Burdine, 450 U.S. at 256, 101 S.Ct. at 1095; Fields v. Bolger, 723 F.2d 1216, 1219 (6th Cir.1984). This allocation of the respective burdens may also be applied in the adjudication of race discrimination claims arising under 42 U.S.C. Sec. 1981, Long v. Ford Motor Co., 496 F.2d 500, 505 n. 11 (6th Cir.1974), and Michigan's Elliott-Larsen Act, Michigan Civil Rights Commission ex rel. Boyd v. Chrysler Corp., 80 Mich.App. 368, 375 n. 4, 263 N.W.2d 376, 380 n. 4 (1977); see generally Department of Civil Rights ex rel. Parks v. General Motors Corp., 93 Mich.App. 366, 375, 287 N.W.2d 240, 244 (1979) ("Federal law provides a good general source for interpreting state civil rights legislation because of the great number of decided cases."), aff'd, 412 Mich. 610, 317 N.W.2d 16 (1982).
 
 
 25
 However, the essential factual inquiry in such a case is still " 'whether the defendant intentionally discriminated against the plaintiff' " U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (quoting Burdine, 450 U.S. at 253, 101 S.Ct.at 1093). The findings of the trial court on this issue are subject to review only under the "clearly erroneous" standard of Civil Rule 52(a). See Pullman-Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).
 
 B.
 
 26
 In the case before us, it appears that the parties met their respective burdens under the first two steps of the McDonnell Douglas/Burdine analysis. Grubb proved: (1) that he was black; (2) that he was qualified for retention in Hospital's employ as either an assistant laundry director or a laundry supervisor; (3) that he was not so retained despite his qualifications; and (4) that Hospital instead retained as laundry supervisor a white person whose general qualifications were no greater than Grubb's.[9] Hospital, on the other hand, introduced testimony by Willard Carl and Harold Petke which explained the decision to retain Mrs. Fountain, rather than Grubb, as being motivated by Carl's need for a working supervisor, not another manager, and by a view that Mrs. Fountain had performed that role well for many years and should logically be retained therein. Therefore, the judgment of the District Court had to rest on whether or not Grubb carried "the ultimate burden of persuading the court that [h]e has been the victim of intentional discrimination." Burdine, 450 U.S. at 256, 101 S.Ct. at 1095.
 
 
 27
 "In short, the district court [had to] decide which party's explanation of the employer's motivation it believe[d]." Aiken, 103 S.Ct. at 1482. As noted above, Judge Boyle found that Carl's actions evidenced animus against Grubb, and that Grubb's testimony about alleged racist comments by Carl established the unlawful nature of that animus. She further concluded, without further weighing of the evidence, that "while Defendant may have had a valid economic reason for the elimination of a supervisory position in the laundry, it does not follow that the decision to terminate Mr. Grubb would have been reached despite Mr. Carl's unlawful animus." 533 F.Supp. at 675. This conclusion is defective for two reasons: (1) it gives considerably greater weight to Grubb's testimony than was due; and (2) it has the effect of changing the nature of Hospital's burden under Burdine.
 
 
 28
 As pointed out by Judge Martin of this Court in the recent case of Brooks v. Ashtabula County Welfare Department, 717 F.2d 263, 267 (6th Cir.1983), the district court in a Title VII disparate treatment case cannot require the defendant to persuade the court that the legitimate reason articulated by said defendant actually motivated the employment decision at issue. It is the plaintiff's burden to persuade the court "that the asserted reason is pretextual." Fields, 723 F.2d at 1219. But the effect of the District Court opinion in this case was to require proof (presumably by the defendant Hospital) that the decision to eliminate Grubb's job "would have been reached" regardless of any racism on Carl's part.
 
 
 29
 Although Grubb testified that Carl had exhibited racial bias on at least two occasions, there is no other evidence in the record of racial bigotry on his part, or that of any other Hospital official. The evaluation of Grubb's work made by Mr. Carl in early 1977 (App. at 628-29) does not evidence any propensity by Carl to act according to his alleged racial bias, even though the subjective nature of such an evaluation would give him an opportunity to do so. A comparison of that evaluation with those made by Harold Petke when he was Grubb's immediate superior at Mercy Hospital (App. at 630-88) fails to show any significant change in how Grubb's job performance was viewed. Judge Boyle specifically found no evidence of discriminatory motives in either Petke or Culhane, the two other administrators most directly involved in Grubb's termination. Both Mrs. Fountain and Ms. Osborne, with whom Grubb acknowledged being on friendly terms, could recall no incidence of discrimination by Carl, and Ms. Osborne (whom Carl allegedly wanted to fire, and referred to as a "nigger") stated that she and Carl were friendly and would occasionally visit each other's homes. Furthermore, Grubb never complained about Carl's alleged racism to anyone in Hospital's administration, or even filed a formal grievance on that basis when his position was eliminated.[10]
 
 
 30
 It is true, of course, that an employer may be held liable under Title VII "for the discriminatory actions of its supervisors which affect the tangible job benefits of an employee on the basis of race." Henson v. City of Dundee, 682 F.2d 897, 909 (11th Cir.1982). But this operation of the doctrine of respondeat superior should not dissuade the court from requiring the Title VII plaintiff to prove his case, particularly where (as here) an eleemosynary institution stands at risk for high amounts of damages and attorneys fees, and there were legitimate, nondiscriminatory reasons for its eliminating unnecessary expenses and pursuing the course it did in a combined facility. Although Grubb's testimony, when viewed in isolation, could be substantial evidence for the District Court's finding of racial animus, that finding must be reviewed in light of the entire record, and reversed when it is against the clear weight of the evidence. Johnson v. United States, 600 F.2d 1218, 1222 (6th Cir.1979). See also 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2585, at 731, 735 (1971).
 
 
 31
 Grubb's counsel cited, at oral argument, to Bell v. Birmingham Linen Service, 715 F.2d 1552 (11th Cir.1983), for the proposition that direct evidence of discriminatory intent, when presented by a Title VII plaintiff, will shift to the employer the burden of proving (not merely producing ) legitimate, nondiscriminatory reasons for its action. However, Bell infra, is distinguishable since the plaintiff there was confronted, when she applied for a "washman" position at the defendant's plant, with a statement that if she were given the job "every woman in the plant would want to go into the washroom." Id. at 1553. In the case at bar, there is no evidence that Carl or any other Hospital official made any racially derogatory remark, or gave other direct evidence of discriminatory intent, in connection with the actual decision to eliminate Grubb's job.
 
 
 32
 Moreover, the court below failed to appreciate the strength of Hospital's proffered reason for Grubb's termination. Prior to the acquisition of Mercy Hospital by Foote Memorial (and even after the acquisition but before Carl's appointment as overall director), Grubb and Carl each held essentially equivalent positions in their respective hospital laundries. In particular, each of them took care of the managerial and administrative aspects of the laundry operations (preparing budgets, ordering supplies, setting work standards, hiring and firing laundry workers). At Mercy (and later Foote West), Rosella Fountain acted as a direct supervisor of the day-to-day work in the laundry, observing the employees' job performance, setting work schedules, and generally seeing that the laundry work was actually done (even performing such work herself, when necessary). Since Carl did not have a supervisor under him at Foote East, he presumably did some of those things himself, but his appointment as laundry director for the combined hospitals clearly established him in the administrative role.
 
 
 33
 Although the transitional situation of two separate laundries, on two opposite sides of town, reasonably required the presence of a second manager at Foote West (since Carl could not be at two places at once), the consolidation of the laundry facilities at Foote East in 1977 eliminated the need for an additional administrator. However, it was likely that the size of the combined laundry would necessitate the employment of an "on-line" supervisor, under Mr. Carl, who could directly oversee the laundry employees on a continuous basis. Such a role was already being performed by Mrs. Fountain, and had been for some 13 years. Therefore, she was a logical choice for retention when one of the two lower supervisory employees in the laundry had to be eliminated in the consolidation.
 
 
 34
 Grubb, and the District Court, make much of the "subjective" nature of the criteria used by Carl in reaching his decision on which position to eliminate.[11] Besides the fact that subjectivity of evaluation is not a per se indicator of discrimination,[12] we note that Carl's criteria were not wholly subjective. It was an objective fact that Grubb and Carl had performed the same function at the two hospitals, and that only one person would be needed to perform that function at the combined facility. It was also an objective fact that Rosella Fountain was already working as the kind of supervisor Carl would still need in the laundry. To the extent that he also considered Mrs. Fountain to be more "cooperative" and better able "to work with the women" than Grubb, he was employing subjective judgment. But that subjectivity, without substantial proof of racial bias in its exercise, does not constitute unlawful discrimination.
 
 
 35
 It is also contended that Carl's alleged criteria were a sham because they were not applied to Grubb. This argument ignores the fact that Carl was not required to choose whether to retain Mr. Grubb or Mrs. Fountain in the same type of position, but rather whether to retain an assistant laundry director or a laundry supervisor. Carl's standards were applied to Grubb, in the sense that it was determined that he was performing duties that Carl himself could perform in the consolidated facility, and thus the assistant director position would be superfluous. And to hold that Carl and Hospital should have "bumped" Mrs. Fountain from her job, and replaced her with Grubb, would interfere with a legitimate management decision to retain an employee in a position which she had well and faithfully performed for many years. Also, such a decision could well have left Hospital open to a sex discrimination charge instead.
 
 
 36
 From an examination of the trial testimony of the two individuals, we come away with a picture of a rivalry caused when a man is suddenly placed into a superior position over another man. Both gentlemen originally held analogous positions in their respective laundries, but the administrative restructuring after the merger no doubt left a certain amount of resentment in Mr. Grubb, who might have received the higher post himself, and likewise left Mr. Carl, a man with perhaps less experience, in an insecure position where he had to contend with Grubb's ideas of how things should be done. This impression is fortified by the following testimony given by Plaintiff at trial:
 
 
 37
 Q Now, do you believe that Mr. Carl let you go because he thought if you stayed you would show him up?
 
 
 38
 A Yes, sir.
 
 
 39
 * * *
 
 
 40
 Q Why do you believe that was the problem?
 
 
 41
 A Well, there were things that go in the laundry that only one familiar with the functions of a laundry operation. There are many functions and those functions are phases, now, systems now, that I see that were going on within that department that would have been corrected, should have been corrected long before I went over there. I thought that some of the things I mentioned to Mr. Carl and Mr. Carl said the laundry had run that way; it was running good and that it was running fairly good, but it could have been improved. You could improve on most anything. For those reason [sic.], I think Mr. Carl didn't want me to implement those things.
 
 
 42
 (App. at 324).
 
 
 43
 Taken altogether, we cannot help but find that Grubb failed to prove, by a preponderance of the evidence, that a racially discriminatory purpose was the more likely motivation for the decision to eliminate his job, or that Hospital's proffered reason for that decision is unworthy of credence. It appears from the record that Willard Carl did bear considerable animus toward Grubb (and the reverse may also be true), and our holding should not be construed to say that Grubb, a man who has led a productive and meritorious life, was fairly treated by Carl. However, a personality conflict between two individuals which leads to an unfortunate result does not automatically imply unlawful racial discrimination actionable under civil rights statutes just because the loser in that conflict happens to belong to a racial minority. In view of the weakness of Grubb's evidence of discriminatory motivation for his discharge, and the strength of Hospital's explanation for its decision, we must--when faced with the District Court's finding on this issue--be "left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).
 
 
 44
 Even if we must credit the District Court's finding of fact that Willard Carl made the two racially derogatory remarks to Grubb, the District Court was erroneous in relying solely on these remarks for its finding of racial animus in regard to the decision to eliminate Grubb's position. The following testimony by Grubb indicates that Carl's question to him, "When are you going to fire those niggers?", was made more out of anti-union animus than racially motivated animus:
 
 
 45
 When they found out that Foote Hospital was sold, they went to investigating and applying for union membership .... So, Willard Carl found out that [Lurlene Osborne] was the ringleader ... [S]o he said to me that "I want you to fire [Osborne and two other minority employees]" .... I didn't do anything ... on that order. A week came by and he [Carl] came back .... We started out the door ... and he said to me ... "When are you going to fire those niggers?"
 
 
 46
 (App. at 297-98). Carl was asking Grubb to fire these employees, not because they were black, but because of their union activities, albeit in a racially derogatory manner. The expressions used were offensive, uncalled for, and, at the same time, out of character based on all the other proof in the case.
 
 
 47
 In addition, it appears that the District Court based its decision, to credit Grubb's testimony that Carl directed Mrs. Fountain to report to him because "[a] black man has no place supervising white women," on an erroneous finding. The District Court found that it was "undisputed" that Carl directed Fountain to report to him, but Fountain clearly testified that she continued reporting to Grubb while they were still at West:
 
 
 48
 Q Did you continue to report to Mr. Grubb [while you were still at West]?
 
 
 49
 A Yes, sir.
 
 
 50
 (App. at 348). Grubb himself also testified that Fountain continued reporting to him until they were "completely moved," at which point Grubb's position was terminated. Even if Carl told Grubb black men should not supervise white women, this statement had no effect on Grubb's position or his supervisory status over Fountain since Fountain continued to report to him; it was, again, entirely inconsistent with Carl's conduct in dealing with Grubb and Fountain.
 
 IV.
 
 51
 We turn next to the District Court's conclusion that the evidence adduced at trial did not show that the elimination of Grubb's position was motivated by unlawful age-biased discrimination. For the following reasons, this Court holds that said conclusion was supported by substantial evidence and is not clearly erroneous.
 
 
 52
 It is not necessary, under the Age Discrimination in Employment Act (ADEA), for a plaintiff to establish a prima facie case using the factors laid down in McDonnell Douglas, supra, with respect to Title VII cases.[13] Blackwell v. Sun Electric Corp., 696 F.2d 1176, 1179-80 (6th Cir.1983); Laugesen v. Anaconda Co., 510 F.2d 307, 312 (6th Cir.1975). The preferred approach, supported in the legislative history of the Act, is to determine the existence of a prima facie showing of age discrimination on a case-by-case basis. Sahadi v. Reynolds Chemical, 636 F.2d 1116, 1118 & n. 3 (6th Cir.1980).
 
 
 53
 The Ninth Circuit has developed a reasonable and flexible standard for making such a determination: To establish a prima facie case, the plaintiff must prove, by the preponderance of the evidence, that he was within the protected class (persons between the ages of 40 and 70), and was performing satisfactorily, and that he was discharged " 'under circumstances which give rise to an inference of unlawful discrimination.' " Douglas v. Anderson, 656 F.2d 528, 531 (9th Cir.1981) (quoting Burdine, 450 U.S. at 253, 101 S.Ct. at 1094). This last requirement might be met "by using the McDonnell Douglas criteria ... [or by] using statistical information, direct evidence of discrimination, and circumstantial evidence other than that which is used in the McDonnell Douglas criteria." Blackwell, 696 F.2d at 1180. If a prima facie case is established by the plaintiff, the burden of production of a legitimate, nondiscriminatory reason shifts to the employer, but the plaintiff nevertheless retains the burden of proving that he was discharged because of his age. Id.; Laugesen, 510 F.2d at 313. The same evidentiary burdens apply to age discrimination cases brought under the Elliott-Larsen Act. Gallaway v. Chrysler Corp., 105 Mich.App. 1, 5, 306 N.W.2d 368, 370-71 (1981).
 
 
 54
 Since the "ultimate issue is whether age was a factor in [Carl's decision] and whether [Grubb's] age ... made a difference in determining whether he was to be retained or discharged," Ackerman v. Diamond Shamrock Corp., 670 F.2d 66, 70 (6th Cir.1982), and since Grubb failed to prove that his age was such a determining factor, we need not specifically examine whether or not he met the initial burden of a prima facie case. Either in the prima facie showing, or in his attempt to rebut Hospital's asserted reason for his termination, Grubb's proofs did not give rise to or sustain a reasonable inference that Carl was motivated by age bias.
 
 
 55
 The only potential evidence of such bias was Carl's alleged statement that Grubb was "old and set in his ways," and various instances where Carl allegedly made comments about Grubb's health and encouraged him to retire. The meaning of these remarks is ambiguous at best, and--when considered with the logic of a decision to eliminate Mr. Grubb's job rather than Mrs. Fountain's[14]--does not support a finding that age was a motivating or determining factor.
 
 
 56
 It may not be necessary, in the context of a reduction-in-force case, for the plaintiff to show that he was replaced by an individual outside the ADEA-protected age group, Baldwin v. Sears, Roebuck & Co., 667 F.2d 458, 462 (5th Cir.1982), and "replacement by even an older employee will not necessarily foreclose prima facie proof if other direct or circumstantial evidence supports an inference of discrimination," Douglas v. Andersen, 656 F.2d at 533. But the relative age of the retained employee will affect the likelihood that such an inference can be reasonably drawn. Id. We agree with the court below that "the fact that Mrs. Fountain was approximately 63 years old at the time Mr. Carl selected her position for retention," 533 F.Supp. at 675, severely undercut the likelihood of Carl's decision being predicated on age bias.
 
 
 57
 Telling Grubb that he was "old and set in his ways," in the context of a dispute over which kind of sheet to use on the hospital beds, appears to reflect Carl's recognition that Grubb was stubborn in insisting that his way to manage the laundry (including the type of bed sheet to purchase) was the correct way. Also, the remarks about retirement were, according to Grubb's own testimony, connected with his increasingly frequent absences from work due to health problems. If Carl were otherwise disposed to eliminate Grubb's position, he might well have tried to persuade him to retire and thus avoid a confrontation when the position was abolished in the new budget.
 
 
 58
 It appears (as in the claim of race discrimination) that some of Carl's actions--particularly his handling of the actual termination--evidence a personal hostility toward Grubb himself, not prejudice against a black man or a man in his sixties. He may have perceived Mr. Grubb as a rival for authority in the laundry, or perhaps as an obstacle to his plans for the laundry, but "[p]ersonality conflicts alone cannot supply a basis for an ADEA claim." Ackerman, 670 F.2d at 70. Even Grubb recognized, as a past administrator, that reductions in the labor force provide an opportunity to eliminate those employees "that might cause you the most trouble." (App. at 326). A subjective judgment to discharge an employee can be made for any nondiscriminatory reason, Ackerman, supra, and that reason "need not meet the unqualified approval of the judge or jury," Douglas v. Andersen, 656 F.2d at 534. Therefore, we uphold Judge Boyle's denial of Grubb's age discrimination claim.
 
 V.
 
 59
 Finally, we come to Grubb's pendent claim asserting that Hospital's failure to observe its alleged layoff policies with respect to his termination constituted a breach of implied contract under Michigan law. The District Court entered judgment for Hospital on this claim, and we affirm.
 
 A.
 
 60
 Although Judge Boyle permitted Grubb to amend his complaint at trial in order to add the breach of contract claim, she ultimately declined to extend the doctrine of Toussaint v. Blue Cross & Blue Shield, supra, to the facts of this case, absent further guidance from the Michigan courts. Thus, the District Court may be seen to have decided ultimately not to exercise its jurisdiction over the implied contract claim.[15]
 
 
 61
 A state law claim asserted in the same action with a federal claim may be heard and decided by the district court, provided that (1) the federal claim is substantial, and the state and federal claims derive from a "common nucleus of operative fact," and (2) the court exercises its discretion to decide the state-law issues. United Mine Workers v. Gibbs, 383 U.S. 715, 725-26, 86 S.Ct. 1130, 1138-39, 16 L.Ed.2d 218 (1966); Ray v. Tennessee Valley Authority, 677 F.2d 818, 825 (11th Cir.1982), cert. denied, 458 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983). Once the first part of this test is met,[16] the court should weigh "considerations of judicial economy, convenience and fairness to litigants," 383 U.S. at 726, 86 S.Ct. at 1139, in determining whether to exercise jurisdiction.
 
 
 62
 In making that determination, the court should avoid "[n]eedless decisions of state law ... both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." Id.; Financial General Bankshares, Inc. v. Metzger, 680 F.2d 768, 772-73 (D.C.Cir.1982); Jackson v. Stinchcomb, 635 F.2d 462, 473 (5th Cir.1981). This rule is based on "the desirability of having a reliable and final determination of the state claim by state courts, having more familiarity with the controlling principles and the authority to render a final judgment." Hagans v. Lavine, 415 U.S. 528, 548, 94 S.Ct. 1372, 1385, 39 L.Ed.2d 577 (1974).
 
 
 63
 Here, Grubb sought to apply the Toussaint doctrine--under which an employer's established policy to discharge employees only for cause could give rise to an enforceable contractual right--to the layoff context. He argues that Hospital's policies with regard to layoffs were violated when he was permanently discharged (and not merely placed on layoff status) upon the elimination of his job, and also when he was not considered for later openings at Hospital for which he was qualified. Assuming arguendo that Hospital had such an established policy, and that said policy was violated as to Grubb, it nevertheless appears that Michigan courts have not, as yet, extended Toussaint to situations not involving a wrongful discharge from a continuing position.
 
 
 64
 Although, as the court below admits, the language of the Toussaint opinion may well be broad enough to encompass employer policies governing conditions under which an employee can be laid off for economic reasons, we can understand the reluctance of the District Court to take the initiative and "lead" the Michigan courts in that direction. Our respect for the role of the state courts as the principal expositors of state law counsels restraint by the federal court in announcing new state-law principles, or applying such principles to novel situations. Expanding the scope of the Toussaint doctrine to the facts of this case would entail imposition of an implied contractual duty on an employer to rehire an employee whose services had no longer been needed, and not merely to refrain from arbitrarily discharging an employee. The reach of such a duty has yet to be presented to, and determined by, the Michigan state courts, and the unsettled nature of the state law on this issue was an entirely appropriate factor for the District Court to consider in exercising its broad discretion in hearing pendent state-law claims. Moore v. County of Alameda, 411 U.S. 693, 716, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973). We cannot say that such discretion was abused in this instance.
 
 B.
 
 65
 The entry of judgment for Hospital on the contract claim may also be supported on the merits, assuming that Toussaint could properly apply to these facts. The evidence presented at trial does not appear to show that any layoff policy or practice established during Grubb's tenure at Hospital was violated in his discharge.
 
 
 66
 The Michigan court explained the implied obligation recognized in Toussaint, using the following language:
 
 
 67
 While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever, the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "instinct with an obligation."
 
 
 68
 408 Mich. at 613, 292 N.W.2d at 892.
 
 
 69
 Grubb first contends that Foote Memorial Hospital Policy No. 355[17] was violated when he was (1) not placed on layoff status but was instead permanently terminated, and (2) not recalled when vacancies thereafter arose at Hospital. This argument overlooks the fact that the specifics of this policy were not established in written form until July 1, 1978, an entire year after Grubb was discharged. And Hospital's personnel director, Gerald Culhane, testified at trial that the principles of the written policy were only generally followed prior to that date since layoffs were "just something that generally didn't exist before that." (App. 177). Moreover, Grubb never testified that he had even a "subjective expectation" that any policy or practice would be followed regarding layoffs at Hospital. Absent any clear showing that Hospital, prior to Grubb's termination, had established a policy with any set requirements, whether through written or oral statements or through past practice, we cannot see how it created a situation "instinct with an obligation" to Grubb.
 
 
 70
 Additionally, Grubb relies on the following statement in Hospital's employee handbook (which had been in distribution since 1976):
 
 
 71
 If a reduction in work force of a department is necessary, layoffs will be carried out along the lines of seniority, providing those persons can satisfactorily perform the duties required. Every consideration will be made for possible transfers to positions in other departments for which you might qualify. It is also hoped that any layoffs would be on a temporary basis.
 
 
 72
 (App. at 773). In response to this, we note again that Mrs. Fountain had greater seniority in the laundry department than Mr. Grubb, and nothing in the record shows that any relevant position in another department was available in July 1977. Hospital's expression of "hope" that layoffs would be temporary cannot, by itself, reasonably support an implied obligation to recall laid-off employees, absent any evidence that Hospital had, in practice, recalled such employees whenever a relevant position opened up in the future. An important factor present in this case is that Hospital was then undergoing the process of consolidation and restructuring following the merger of the two institutions. To expect clear and firmly established personnel policies during such a period is somewhat unrealistic, and we find none on which Grubb can base his claim for relief.
 
 VI.
 
 73
 Accordingly, the judgment of the District Court, insofar as it finds for Plaintiff on his claim of racial discrimination and grants monetary and other relief thereon, is REVERSED. In all other aspects, the judgment is AFFIRMED, and the cause is REMANDED to the District Court for dismissal of Plaintiff's complaint.
 
 
 74
 ENGEL, Circuit Judge, dissenting.
 
 
 75
 I respectfully dissent. As have my colleagues, I have carefully examined the district court record. I, however, reach a different conclusion.
 
 
 76
 It is difficult enough to bring the reality of a complex human dispute such as this into the trial courtroom. It is even more difficult to reconstruct that reality from a transcript of the trial. It is this double removal from reality which makes the clearly erroneous rule so necessary a requirement of appellate review.
 
 
 77
 There is no need to quarrel with the detailed recitation of facts in the majority opinion, which is but a summary of the extensive testimony and documentary evidence heard by Judge Boyle in this five day bench trial. The motives behind the Hospital's action in discharging Charles W. Grubb were probably mixed, and it is possible to draw a number of differing and even conflicting inferences from the proof. The discharge may have been prompted by business necessity, by animus against Grubb because of his personality, or by a deep-seated resentment against him because of his advanced age or his race. As the facts recited in the majority opinion make clear, there was evidence from which any of the foregoing conclusions could have been reached by the trial judge, the person to whom the law has assigned the task of unscrambling the facts and ascertaining the truth.
 
 
 78
 According to the majority, the district court opinion improperly implied that the Hospital had the burden of proving that Grubb would have been discharged even in the absence of racial animus. The majority emphasizes that the ultimate burden of proof should have been placed on the plaintiff. Yet the district judge did just that. She stated her conclusions as follows:
 
 
 79
 Assuming arguendo that the Plaintiff must prove that race or age was a determining factor in the employer's decision in the sense that "but for" the employer's motive to discriminate the action would not have been taken, Loeb v. Textron, Inc., 600 F.2d 1003, 1019 (1st Cir.1979), Plaintiff has succeeded in persuading the Court that Mr. Carl's selection of Mr. Grubb for termination was made for unlawful reasons. Necessarily, if the fact finder is persuaded that race and/or age was a determining factor in the decision, it cannot be concluded that "the employer also had a lawful non-discriminatory motivation for his actions which when considered by itself would have caused the same result as his discriminatory purpose." King v. Laborers Local 818, [443 F.2d 273, 279 (6th Cir.1971) ] (emphasis added). Stated otherwise, while Defendant may have had a valid economic reason for the elimination of a supervisory position in the laundry, it does not follow that the decision to terminate Mr. Grubb would have been reached despite Mr. Carl's unlawful animus.
 
 
 80
 Accordingly, I conclude that judgment must enter in favor of Plaintiff on the claim that the discharge was in violation of Title VII .... The single remark regarding age, however, does not persuade me that age was a causal factor in the action taken, particularly when considered with the fact that Ms. Fountain was approximately 63 years old at the time Mr. Carl selected her position for retention. I therefore find in favor of Defendant on the age claim ....
 
 
 81
 Grubb v. W.A. Foote Memorial Hospital, Inc., 533 F.Supp. 671, 675 (E.D.Mich.1981). It is possible, in hindsight, to question the factual findings made by the trial judge. However it is beyond question, in my judgment, that she concluded that while Grubb had not proved discrimination on account of his age, he had proved that he had been discharged because of his race. I think that there is substantial evidence, even in the majority opinion's summary of the evidence, to support this conclusion.
 
 
 82
 I find nothing in the record to indicate any predisposition on the trial judge's part toward the particular result which she ultimately reached. On the contrary, she appears to have done exactly what she was expected to do: "decide which party's explanation of the employer's motivation [she] believes." United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). She considered the credibility of the many witnesses who testified; she weighed the evidence; she drew those inferences from the evidence which appeared to her to be most consistent with reality.
 
 
 83
 In short, I have concluded from examining the record that the issues in this appeal were primarily factual, and that Judge Boyle's finding of racially discriminatory intent as a causal factor in Grubb's termination was not clearly erroneous. Likewise, while her conclusions might have been more artfully expressed, they left no doubt that she believed, upon the evidence, that but for his race, Grubb would have remained in the employ of the Hospital.
 
 
 84
 With all due respect, it appears to me that the majority has done no more than re-try this case upon the record on appeal and has reached a different though perhaps equally plausible result. This, in my opinion, it is not our function to do.
 
 
 
 [1]
 After his mother's death when he was only eight years old, Grubb, the eldest of three children, was often left in charge of the family whenever his father left home to work on the railroad. Beginning at age 16, he had to leave the family several times in order to find work and earn money with which to support his two younger sisters. On one of these occasions, Grubb worked for a farmer in Maryland for fifteen dollars a month plus room, board and clothing. Later, during the Great Depression, he served as a manual laborer in the Civilian Conservation Corps, at which time he helped build Seashore State Park near Virginia Beach, Virginia. After enlisting in the Army in 1941, Grubb ultimately became a chemical warfare instructor at Ft. Custer, and then served honorably with the artillery in France and Germany. His entire work record has shown an industry and determination to "get ahead in the world" which one may rightly deem admirable
 
 
 [2]
 Hospital does not dispute Grubb's overall qualifications and job performance
 
 
 [3]
 Grubb does not contest the decision, in 1976, to make Mr. Carl, and not himself, the director for the combined laundry operation
 
 
 [4]
 It appears that Culhane initially treated Grubb's situation as a layoff, but then made it a final termination when it appeared that there were no available jobs in which Grubb would be interested. Also, Grubb was unable to receive severance pay until the termination was made final. However, as a consequence, Grubb was never contacted about later job openings at the Hospital (including the time when Carl left to take a job in Memphis, but returned unexpectedly after about six months)
 
 
 [5]
 In Toussaint, the Michigan Supreme Court held that an established company policy not to discharge employees except for cause could give rise to a contractual duty, on the part of the employer, to follow that policy
 See part V of this opinion, infra.
 
 
 [6]
 The October 30th order had already reduced the back pay award by the amount ($3,600.00) that Grubb had actually earned at the later job. 533 F.Supp. at 676
 
 
 [7]
 By this time (November 15, 1982), Mr. Carl had again resigned from Hospital, Mrs. Fountain had retired, and the supervisor position was eliminated as another economic measure. Judge Boyle, however, considered the elimination of the supervisor position to be a legitimate business decision, and deemed the court powerless to place Grubb in a higher position (i.e., the director's post) than the one he previously held
 
 
 [8]
 In McDonnell Douglas, the Court set, as a model for such a prima facie case, the requirement that the plaintiff show:
 (1) that he belongs to a racial minority;
 (2) that he applied and was qualified for a job for which the employer was seeking applicants;
 (3) that he was rejected despite his qualifications; and
 (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of the plaintiff's qualifications.
 411 U.S. at 802, 93 S.Ct. at 1824. Since this model was formulated in the context of a discriminatory hiring case, it must be applied mutatis mutandis to other instances of alleged race discrimination "with respect to ... terms, conditions, or privileges of employment." 42 U.S.C. Sec. 2000e-2(a)(1) (1976). See Burdine, 450 U.S. at 253-54 n. 6, 101 S.Ct. at 1093-94 n. 6.
 
 
 [9]
 It should be noted, however, that Mrs. Fountain had greater seniority in the Mercy Hospital laundry, having served there since 1940 while Grubb only started there in 1957. But once the Hospital carried its burden of production it was no longer relevant whether or not Grubb had actually made out a prima facie case. See Aikens, 103 S.Ct. at 1482. Judge Boyle apparently felt that he did so, in light of her denial of a directed verdict for Hospital at the close of Grubb's proofs. See id. at n. 4
 
 
 [10]
 Although personnel director Culhane may have dissuaded Grubb from pursuing the grievance procedure--telling him it was "no use" going to the hospital president--there is nothing in the record to show that Culhane was aware that Grubb objected to his termination on grounds of race or age discrimination rather than mere dissatisfaction with the decision per se
 We do not consider significant, in light of the lower court's finding of no discriminatory intent on the part of other Hospital officials, any alleged failure to follow Hospital's policies with regard to layoffs (see part V infra ). Mr. Carl took no apparent part in those decisions; his role in these events ended with his handing the termination notice to Grubb. Therefore, his alleged unlawful animus cannot be imputed to any later occurrences.
 
 
 [11]
 The descriptions of these criteria in Mr. Petke's testimony (App. at 51-54) and Mr. Carl's testimony (App. at 230-38) at trial are admittedly imprecise, but they essentially boiled down to a determination that Mrs. Fountain's experience in directly supervising the laundry workers, and in scheduling their work hours and daily activities, was needed more in the consolidated laundry than Grubb's experience in overall management of a laundry facility, a task Carl considered himself capable of doing
 
 
 [12]
 Brooks, 717 F.2d at 267-68; Ward v. Westland Plastics, Inc., 651 F.2d 1266, 1270 (9th Cir.1980); Roman v. ESB, Inc., 550 F.2d 1343, 1354 (4th Cir.1976); Rich v. Martin Marietta Corp., 522 F.2d 333, 338-39 (10th Cir.1975)
 Although Judge Boyle cites Long v. Ford Motor Co., 496 F.2d 500, 506 (6th Cir.1974), and Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir.1972), it should be noted that Rowe (cited in support of the dicta in Long ) dealt with allegations of disparate impact on minorities by a facially neutral policy, not a case of alleged disparate treatment due to intentional discrimination. Although subjective evaluations may give greater leeway to personal bias, they do not have the importance in disparate treatment cases (like this one) that they have in disparate impact cases where subjectivity can provide the crucial link between employment statistics unfavorable to minorities and a showing that those statistics reflect unlawful discrimination. Ward, 651 F.2d at 1270 n. 1.
 
 
 [13]
 See note 9, supra
 
 
 [14]
 See part III(B) of this opinion, supra
 
 
 [15]
 This conclusion is reinforced by the fact that the court only dealt with this claim in a footnote at the outset of the opinion. 533 F.Supp. at 672-73
 
 
 [16]
 We may assume, without deciding, that the alleged breach of contract arose from the same "nucleus of operative fact" (the termination of Grubb's employment at hospital) as his federal-law claims, and thus the District Court had the power to exercise pendent jurisdiction in this case
 
 
 [17]
 Policy No. 355 provides, in pertinent part, as follows:
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE