Charles H. **GRUBB**, Plaintiff,

v.

**W. A. FOOTE MEMORIAL HOSPITAL INC., a Michigan corporation, Defendant.**

**Civ. A. No. 79–70434.**

United States District Court, E. D. Michigan, S. D.

Oct. 30, 1981.

Joseph Marshall, III, Detroit, Mich., for plaintiff.

Jerome Susskind, Jackson, Mich., for defendant.

## OPINION AND ORDER GRANTING JUDGMENT IN FAVOR OF PLAINTIFF

PATRICIA J. BOYLE, District Judge.

Plaintiff, Charles H. Grubb, brought an action alleging that he was terminated from his position at W. A. Foote Memorial Hospital, Inc., due in whole or part to his race and/or his age. Plaintiff based his action on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1870, 42 U.S.C. § 1981, the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq., and the Michigan Civil Rights Act, Mich. Comp. Laws Ann. § 37.2101 *et seq.** Plaintiff

---

* At the time of trial, Plaintiff was permitted, over Defendant's objections, to amend the complaint, to add a theory of breach of contract based the authority of *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292

N.W.2d 880 (1980), in which the Michigan Supreme Court recognized a cause of action for wrongful discharge of an employee at will based upon a record that would permit the fact finder to infer that there was a company policy

seeks reinstatement, back pay (including fringe benefits) and interest, damages for emotional distress, punitive damages, liquidated damages pursuant to 29 U.S.C. § 626(b) of the ADEA, and attorney fees.

A bench trial having been held, the following will constitute findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

Plaintiff is a sixty-four-year-old black man who, prior to his separation from employment in 1977, was for eighteen years Laundry Manager for the Sisters of Mercy Hospital in Jackson, Michigan. There is no dispute that during those years Mr. Grubb was an exemplary employee nor that he is qualified for the position of supervisor of the laundry. In 1975 Foote Memorial Hospital purchased Mercy Hospital, the latter being renamed W. A. Foote Memorial Hospital, West (Foote West). This acquisition and a subsequent administrative direction to undertake cost containment policies is the factual backdrop of the instant situation.

At the time of consolidation, Ms. Rosella Fountain was employed by the Sisters of Mercy in the laundry as a supervisor. Ms. Fountain's duties as a supervisor included line supervision such as sorting, packaging, and scheduling. Ms. Fountain was supervised by Mr. Grubb, had been employed at Mercy for forty years, and was likewise a highly qualified employee. Mr. Willard Carl was the Director of Laundry Services at the acquiring hospital (Foote Memorial East).

Following administrative consolidation, the Laundry Committee, which had been charged with responsibility for suggestions regarding laundry consolidation, recommended the centralization and physical consolidation of laundry services at Foote East with delivery of linens to Foote West (Exhibit 10). The memo recommended, in pertinent part, the following consolidated personnel table: one manager, one assistant manager, one crew leader, and elimination of the supervisor position. Thus, in 1975, the projected personnel table contemplated two managerial positions and the elimination of the supervisor position (Ms. Fountain's position).

Pursuant to these recommendations, Mr. Grubb was designated Assistant Department Head of the Laundry as of April 1, 1976, and Mr. Carl became Department Head of the consolidated laundry (Exhibit 36). The supervisor's position was not eliminated.

In late 1976 or early 1977, Mr. Carl proposed a laundry budget for 1978–1979 to the Defendant's central budgetmaking authority, suggesting the elimination of the assistant department head position (Mr. Grubb's position), and the retention of the supervisor position.

Mr. Harold Pelke, the Associate Hospital Administrator responsible for the laundry department, testified that he asked Mr. Carl two or three times regarding elimination of the position and affirmed that Mr. Carl told him there was not a place for Mr. Grubb. Mr. Pelke testified that he did not know whether the hospital had a policy regarding reduction of work force. Mr. Carl also testified he was unaware of whether the hospital had a reduction policy. Mr. Gerald Culhane, Corporate Director of Personnel, testified that Corporate Policy 355 was a codification of an unwritten policy applicable to Mr. Grubb. This procedure requires notification to layed off and qualified workers of vacant positions within the department and the hospital. Despite the fact that Mr. Carl resigned his position in September of 1979 and did not return until March or April of 1980, it is undisputed that the only position offered to Plaintiff was that of a truck driver.

It is also undisputed that there were no written criteria applicable to the question

---

and therefore a contract not to discharge except for just cause and "only in accordance with" established personnel practices and procedures. *Id.* 620, 292 N.W.2d 880. *While the language of the majority opinion may be sufficiently expansive to cover unwritten practices and procedures applicable to a layoff and/or reduction situation, absent further guidance from the state courts, I decline to extend Toussaint to the present factual situation involving a position elimination rather than a discharge case.*

of which position should be eliminated. The testimony establishes that this decision ultimately rested with Mr. Carl. Mr. Carl testified at trial that he selected Ms. Fountain's position for continuation, using, among other criteria, her experience in scheduling, ability to supervise production, supervision, and ability to "work with the women" (a reference to staff personnel with the laundry). Mr. Carl also testified that he did not know whether Mr. Grubb could perform scheduling nor of his abilities in on-line supervision. Fairly characterized, Mr. Carl's testimony can be understood as asserting that he did not apply the criteria to Plaintiff nor did he make an attempt to determine whether Mr. Grubb possessed the skills he deemed necessary for operation of the laundry.

Further, the testimony establishes that Mr. Carl advised Mr. Pelke by February of 1977 that the assistant department head position was eliminated, that Mr. Carl advised Mr. Culhane by spring of 1977 that "there wasn't a place" for Mr. Grubb, and that Mr. Carl advised Ms. Fountain before April of 1977 that he had decided to retain her rather than Plaintiff. However, it was not until July 10, 1977, that Mr. Carl advised Plaintiff that his position had been eliminated by telling him, according to the credited testimony of Plaintiff, "You can call this fired, kicked out or whatever you want, but you're through." This evidence, which was not rebutted, at the least suggests an animus toward Mr. Grubb.

Other credited evidence establishes that the basis for this animus was Mr. Grubb's race and/or age. Mr. Grubb's testimony establishes that Mr. Carl directed him to fire three employees in the laundry that Mr. Carl believed were union activists and that, when Mr. Grubb took no action with regard to this direction, Mr. Carl asked him when he "was going to fire them niggers."

It is also undisputed that Mr. Carl directed Ms. Fountain to report to him rather than to Mr. Grubb. I credit Mr. Grubb's testimony that Mr. Carl's expressed reason for this alteration in line of authority was explained to Plaintiff in the following words: "A black man has no place supervising white women."

Finally, I specifically credit Mr. Grubb's testimony that Mr. Carl told him he was "too old and set in his ways" and that he ought to retire.

I do not find, however, that the actions of either Mr. Culhane or Mr. Pelke in acquiescing in Mr. Carl's determination were prompted by discriminatory motives. The deposition evidence of William Jewell, a former employee of Defendant, to the effect that Mr. Culhane made racially discriminatory remarks, was not persuasive.

These findings of fact support the conclusion that Defendant Foote permitted discriminatory employment practices. Procedures which rested almost entirely on subjective evaluation and favorable recommendations of an immediate supervisor not only had a discriminatory impact on a minority employee but permitted the situation, which the Court finds obtained here, intentional discrimination on the part of an individual employee. *See Long v. Ford Motor Co.*, 496 F.2d 500, 506 (6th Cir. 1974); *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972).

Defendant contends that Plaintiff has failed to sustain the burden of proof and that Defendant had a valid economic reason for elimination of the position. *See Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *King v. Laborers Local 818*, 443 F.2d 273 (6th Cir. 1971).

The parties appear to agree that the applicable burdens and order of proof impose upon the employer the burden of coming forward with evidence of a legitimate non-discriminatory reason for its action which, if sufficient to raise a genuine issue of fact as to its discriminatory purpose, dispels the inference of discrimination arising from Plaintiff's establishment of a prima facie case under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's profferred explanation is unworthy of credence.

*Id.* at 256, 101 S.Ct. at 1095 (citation omitted).

Assuming arguendo that the Plaintiff must prove that race or age was a determining factor in the employer's decision in the sense that "but for" the employer's motive to discriminate the action would not have been taken, *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1019 (1st Cir. 1979), Plaintiff has succeeded in persuading the Court that Mr. Carl's selection of Mr. Grubb for termination was made for unlawful reasons. Necessarily, if the fact finder is persuaded that race and/or age was a determining factor in the decision, it cannot be concluded that "the employer also had a lawful non-discriminatory motivation for his actions which when considered *by itself* would have caused the same result as his discriminatory purpose." *King v. Laborers Local 818, supra*, 443 F.2d at 279 (emphasis added). Stated otherwise, while Defendant may have had a valid economic reason for the elimination of a supervisory position in the laundry, it does not follow that the decision to terminate Mr. Grubb would have been reached despite Mr. Carl's unlawful animus.

 Accordingly, I conclude that judgment must enter in favor of Plaintiff on the claim that the discharge was in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1870, 42 U.S.C. § 1981, and the Michigan Civil Rights Act, Mich.Comp.Laws Ann. § 37.2101 *et seq.* The single remark regarding age, however, does not persuade me that age was a causal factor in the action taken, particularly when considered with the fact that Ms. Fountain was approximately 63 years old at the time Mr. Carl selected her position for retention. I therefore find in favor of Defendant on the age claim and on the breach of contract claim, and judgment for Defendant will be entered accordingly.

As to those claims in which liability has been determined, Plaintiff seeks damages for emotional distress, compensable under the Michigan Civil Rights Act, *see Freeman v. Kelvinator, Inc.*, 469 F.Supp. 999 (E.D. Mich.1979), and punitive damages, under Title VII and Section 1981, *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–1720, 44 L.Ed.2d 295 (1975), in a total amount of Five Hundred Thousand Dollars ($500,000). Plaintiff also seeks back pay and the value of fringe benefits to July, 1981, interest thereon, "front pay" to retirement age should reinstatement not be ordered, and reasonable attorney fees and costs.

Defendant has acknowledged that *Johnson v. Railway Express Agency* allows an award of both equitable and legal remedies. Such damages are recoverable under 42 U.S.C. § 1981 when the claim is joined with a Title VII claim. *Jones v. Metropolitan Hospital*, 88 F.R.D. 341, 343 (E.D.Mich. 1980).

█ The Court awards to Plaintiff under the 1981 claim and the state claim damages for mental anguish and emotional distress. Mr. Grubb's testimony sketched a history of an orphaned child with a seventh-grade education who acquired a GED in the army and began his employment at Mercy Hospital sweeping floors and picking up dirty linen. By virtue of his diligence and a work ethic, which Mr. Grubb described as a belief that "I can do a little bit of everything you can do a lot of," he progressed steadily and in 1961 was appointed laundry manager. In 1966 he was certified by the American Laundry Institute. It is conceded by Defendant that Plaintiff was highly skilled in laundry management, and Mr. Grubb's professionalism and justifiable pride in his accomplishments was evident. The latter was

poignantly underscored by Mr. Grubb's testimony describing his reaction to Exhibit 44, an article from a Jackson, Michigan, newspaper describing his accomplishments: "It was the first time anything had ever been said about anything I did."

The testimony painted a picture of a man of rectitude and dedication who had, through his own effort and determination, overcome the economic and educational limitations on his potential and had secured a position of dignity and status in life. Mr. Carl's belittling direction to Mr. Grubb "to fire those niggers," his statement that a black man has no place supervising white women, his lengthy failure to tell Mr. Grubb that his position was being eliminated during which Mr. Grubb was told by non-supervisory personnel from both hospitals that his position was being eliminated, Mr. Carl's elimination of Mr. Grubb's office at Foote East while Mr. Grubb was at Mercy overseeing the closing of the laundry operation, and his ultimate callousness in telling Mr. Grubb "he was through," caused Mr. Grubb great anxiety and humiliation. Loss of the position, which to Plaintiff represented the culmination of his life efforts, was devastating to Mr. Grubb. He felt useless after a lifetime: "You're not of your worth anymore." The Court awards the Plaintiff Twenty-Five Thousand Dollars ($25,000) in compensatory damages for emotional distress.

■ A finding of intentional discrimination presumptively entitles Mr. Grubb to back pay and reinstatement. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Title VII remedies are equitable and are, in the first instance, committed to the discretionary judgment of the trial court.

Plaintiff has requested reinstatement and testified at trial that if offered the opportunity to return he would do so. While reinstatement has been found inappropriate where Plaintiff has occupied a high level or unique position and the employment relationship has been seriously impaired, it has been said that reinstatement, like back pay, should be denied "only for reasons which, if applied generally, would not frustrate the central statutory purpose of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id.* at 421, 95 S.Ct. at 2373.

Since tension and hostility commonly flow from the filing and litigation of such emotionally charged claims, a sweeping rejection of requests for reinstatement on this ground could frustrate the purpose of Title VII. While the consolidated hospital unit has only twenty-five employees and two managerial-level supervisors, it appears that Mr. Grubb has had a longstanding, close-working relationship with Rosella Fountain and that there is no manifested ill-feeling between he and other hospital executives, such as Mr. Pelke or Mr. Culhane. This litigation has not, in short, been marked by unusual hostility, *see EEOC v. Kallir, Phillips, Ross, Inc.,* 420 F.Supp. 919, 926–27 (S.D.N.Y.1976), aff'd mem., 559 F.2d 1203 (2d Cir. 1977), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977), and I am not convinced that Plaintiff's reinstatement would jeopardize Defendant's legitimate interests in the smooth operation of its laundry services.

THEREFORE, THIS COURT ORDERS that Plaintiff be reinstated to his position as Assistant Department Head in the Laundry Department or a comparable position in the event there is not such a position available, ENJOINS the Defendant from subjecting Plaintiff to any further discriminatory treatment, and AWARDS Mr. Grubb full back pay and benefits from July, 1977, to the date of termination of his employment with Jackson County, less Three Thousand Six Hundred Dollars ($3,600), the amount actually earned during his employment with the Jackson County Medical Society, plus interest to the date of judgment. This finding is subject to modification pending receipt and review of the additional submissions requested below. The Court also awards reasonable attorney fees and costs.

Defendant contends, with respect to the amount of back pay, that back pay should be mitigated by the amount Plaintiff could

have earned by the exercise of reasonable diligence "had he not chosen to quit" his employment with the Jackson County Medical Facility (Defendant's Brief on Damages p. 6). Whether Mr. Grubb's actions were reasonable under the circumstances, that is whether he should have continued his employment and thereby mitigated his damages, is an issue as to which Defendant had the burden of proof. *See Kaplan v. IATSE,* 525 F.2d 1354, 1362–63 (9th Cir. 1975). Plaintiff cites *EEOC v. Ford Motor Co.,* 645 F.2d 183 (4th Cir. 1981), for the proposition that Defendant's liability for back pay does not end when a discrimination victim obtains substantially equivalent employment. While I accept the principle that mere interim employment at substantially equivalent compensation does not as a matter of law terminate entitlement to back pay, this proposition does not meet Defendant's claim that amounts earnable by Plaintiff through continuation of his employment should be deducted from any back pay awards. Nor does it meet the more fundamental question, not raised by Defendant, as to whether during the period of time in which Plaintiff elected to receive early social security payments he was unavailable as a matter of fact and law for reinstatement. The state of the record does not support a conclusion that the "back pay" attributable to post-termination causally flowed from the wrongful termination. *See* B. Schlei & P. Grossman, Employment Discrimination Law 1240 (1976). *See also Hodgson v. Ideal Corrugated Box Co.,* 10 FEP 744, 752 (N.D.W.Va.1974).

Since this issue has not been adequately briefed by either party, I will invite the submission of additional briefs limited to this issue. Briefs on the issue of whether amounts "earnable" with Jackson County should be deducted from the ultimate award and on the issue of whether Plaintiff was unavailable for reinstatement at the time of early retirement are to be filed *within fourteen (14) days* of the entry of this opinion, failing which the Court will conclude that the period of back pay terminated with Plaintiff's cessation of employment in favor of retirement benefits.

With respect to the claim for punitive damages, while the Court has authority under 42 U.S.C. § 1981 to award such damages in certain circumstances, *Johnson v. Railway Express Agency, supra,* I do not conclude that Defendant's managerial-level employees acted in willful and flagrant violation of the law. Plaintiff's examples of willfulness are, in my judgment, more accurately characterized as the omission of carefully drawn objective policies which would, in all likelihood, have ameliorated the potential for the discrimination which I have determined occurred. I do not conclude that the absence of such guidance constitutes oppressive conduct justifying assessment of punitive damages against Defendant hospital. *Cf. Gore v. Turner,* 563 F.2d 159, 164–65 (5th Cir. 1977) (punitive damages awarded due to "seriousness" of Defendant's conduct).

■ Plaintiff having prevailed in the case, the Court is obligated to award attorney fees at a rate consistent with those fees traditionally paid by a fee-paying client and for all time reasonably expended. *Northcross v. Board of Education,* 611 F.2d 624 (6th Cir. 1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980). Plaintiff claims a total of Thirty-Five Thousand Two Hundred Sixty-Three Dollars ($35,263) in fees and a total of One Thousand Two Hundred Eighty-Nine Dollars ($1,289) in out-of-pocket costs. The fees are calculated in terms of hours of services as set forth below.

TABLE IV – FEES AND COSTS

| 1981 | Rate Per Hour | Total Hours | Fee |
|---|---|---|---|
| Joseph C. Marshall, III | $ 80.00 | 152 | 12,160.00 |
| Robert P. Young, Jr. | $ 80.00 | 107 | 8,560.00 |
| Thomas G. Kienbaum | $110.00 | 3 | 330.00 |
| Henry W. Saad | $ 95.00 | 9 | 855.00 |
| Marguerite Mahler | $ 35.00 | 47 | 1,645.00 |
| Warren Hoeft | $ 35.00 | 15 | 525.00 |
| Eric Luden (summer assoc.) | $ 35.00 | 39 | 1,050.00 |
| File Basket Assoc. | $ 30.00 | 2 | 45.00 |
| 1981 Total | | | 25,170.00 |
| **1980** | | | |
| Joseph C. Marshall, III | $ 70.00 | 53.6 | 3,752.00 |
| File Basket Assoc. | $ 30.00 | 1.9 | 57.00 |
| 1980 Total | | | 3,815.00 |

| 1979 | Rate Per Hour | Total Hours | Fee |
|---|---|---|---|
| Joseph C. Marshall, III | $ 65.00 | 69 | 4,485.00 |
| File Basket Assoc. | $ 30.00 | 1.6 | 48.00 |
| 1979 Total | | | 4,533.00 |
| **1978** | | | |
| Joseph C. Marshall, III | $ 60.00 | 7.6 | 456.00 |
| | | | 456.00 |
| Total Fees | | | 33,974.00 |
| Expenses, (see statement attached) | | | 1,289.00 |
| TOTAL: | | | 35,263.00 |

The hourly rate set forth appears reasonable with two exceptions: time and rate attributed to the File Basket Association, the nature and function of which is not described, and the total amount of hours claimed by Mr. Marshall and Mr. Young. While the chart does not distinguish between trial time and pretrial preparation, this Court's official records show that five (5) trial days were had for a total of twenty (20) hours. Both Mr. Young and Mr. Marshall were present throughout the trial, and each actively participated in it. While each commendably performed their respective responsibilities, the presence of two lawyers, where the trial is neither protracted nor complex, cannot be considered traditional in an analogous fee-paying instance. On the assumption, therefore, that the chart represents duplicative billing for trial hours, the total hours claimed will be reduced by twenty (20), at Eighty Dollars ($80) per hour, for a total reduction of One Thousand Six Hundred Dollars ($1,600).

Plaintiff has not requested any upward adjustment reflecting contingency or other unusual factors, and there is not a basis in the record for such an adjustment. Costs, as prayed, appear reasonable and necessary. The total compensation awarded as attorney fees in Thirty-Two Thousand Two Hundred Twenty-Four Dollars ($32,224), representing total fees claimed minus One Thousand Six Hundred Dollars ($1,600) for duplicative attorney fees and minus amounts attributable to the File Basket Association. Claims for additional fees attributable to further briefing may be subsequently presented.

IT IS SO ORDERED.