805 F.2d 1033
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Gladys BIVER, Plaintiff-Appellee,
v.
SAGINAW TOWNSHIP COMMUNITY SCHOOLS, BOARD OF EDUCATION FOR
the SAGINAW TOWNSHIP COMMUNITY SCHOOLS, Ronald
Stelter and David Hinkin, Defendants-Appellants.
 Nos. 85-1434, 85-1575.
 United States Court of Appeals, Sixth Circuit.
 Oct. 27, 1986.
 
 Before ENGEL, CONTIE and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Defendants-appellants Saginaw Township Community Schools, Board of Education for the Saginaw Township Community Schools, Ronald Stelter and David Hinkin appeal from a judgment of the district court in favor of plaintiff-appellee Gladys Biver in her action alleging sex discrimination in violation of Title VII, 42 U.S.C. Sec. 2000 et seq., 42 U.S.C. Sec. 1983, and Michigan's Elliott-Larsen Civil Rights Act, Mich.Comp.Laws Ann. Sec. 37.2101 et seq. Appellants mount a multi-faceted challenge to the district court's judgment. The claims are that:
 
 
 2
 (1) the district court improperly denied the appellants' motions for judgment n.o.v. or, in the alternative, a new trial;
 
 
 3
 (2) the rule in a sex discrimination case should be that a plaintiff who alleges discrimination must prove that he or she is more qualified than the person actually selected;
 
 
 4
 (3) the district court committed several errors in the admission of evidence; and
 
 
 5
 (4) improper remedies were ordered.
 
 
 6
 We conclude that none of the arguments of error is well taken and affirm the judgment of the district court.
 
 
 7
 Gladys Biver has been a physical education teacher at the McArthur High School in Saginaw, Michigan since 1966. Her efforts in 1979, and thereafter, to be hired to coach either the boys' or the girls' basketball teams at McArthur have been unavailing, and she claims it is because the appellants discriminated against her because she is a woman. She claims the discrimination occurred during the years 1979, 1982 and 1984. She alleges that a pattern of discrimination against her began prior to 1979, in retaliation for a lawsuit she filed alleging that female coaches at McArthur were victims of sex discrimination and were paid less than male coaches.
 
 
 8
 The jury in this case awarded Biver $62,000 in compensatory damages against all three defendants, and punitive damages of $2,000 and $1,000 against appellants Stelter and Hinkin, respectively. After submission of post-trial briefs on the issue of additional equitable relief, the district court adopted the jury's finding that the appellants discriminated against Biver on account of her sex and ordered the school board to offer Biver the next available head coach positions of both girls' and boys' basketball teams at McArthur High School. In addition, the court ordered the school board to pay Biver a stipend not to exceed $1,500 per year in order to maintain her coaching skills, with a limit of $750 in any year Biver is coaching. Because appellants claim, inter alia, that the evidence does not support the verdict, we are required to burden our opinion with a rather extensive review of the facts submitted to the jury.
 
 
 9
 Biver has a Bachelor of Science degree in physical education and a Master's degree in curriculum and physical education. Her work experience before coming to McArthur in 1966 included positions at four different schools. At three of those schools, she organized girls' basketball teams. At McArthur High School, she organized and coached the first girls' sports teams in track, tennis and basketball. She coached the McArthur girls' basketball team for five seasons, 1971 through 1975, and compiled a 74-19 won-loss record. During her tenure as coach, the McArthur girls' team was Class B district champion three times, and Class B state runner-up once.
 
 
 10
 Biver testified that after she resigned as coach of the girls' basketball team in 1976, she did not regularly attend high school or college basketball games. She maintained her interest and expertise in basketball by watching games on television, teaching fundamental basketball in physical education classes, listening to basketball experts speak at physical education conventions, reading articles on basketball theory, and studying basketball in a physical education correspondence course.
 
 
 11
 The individual defendants, Ronald Stelter, Athletic Director at McArthur High School, and David Hinkin, Saginaw Township's Assistant Superintendent of Personnel until 1983, admitted that Biver was qualified to coach basketball, although Stelter said he had some reservations. In 1980, both Stelter and Hinkin wrote letters recommending Biver for basketball coaching positions at an out-of-state college.
 
 
 12
 After Biver organized girls' teams in basketball, tennis, and track, a disparity existed in the salaries paid the coaches of girls' and boys' teams. Coaches of boys' teams, all men, were paid more money. The disparity was not resolved until after Biver filed her lawsuit against the school system.
 
 
 13
 Testimony in this case indicated that three individuals in the Saginaw Township school system made discriminatory comments to Biver during and after her effort to obtain equal pay for coaches of girls' teams. Biver testified that Daniel McConnell, Superintendent of Saginaw Township Schools until about 1980, told her that when equal salaries were implemented he would hire only men to coach because he believed men had more expenses, were better coaches, and needed the money more than women. Virginia Johnson, a member of the Saginaw Township School Board, testified that McConnell stated at a budget meeting that "hell would freeze over before he would hire a woman for a boys' coaching position." David Hinkin, the school system's Title IX enforcement officer as well as the Assistant Superintendent of Personnel, testified that while he never heard McConnell make such a statement, "the inference was there."
 
 
 14
 Biver testified that Ronald Stelter, who was Athletic Director throughout the period the discrimination is alleged to have occurred, told her that women should coach girls' sports and men should coach boys' sports. Stelter testified that while that was his personal preference, his paramount objective was to hire the "best qualified person." Stelter testified that if a man and a woman of equal qualifications applied for a boys' coaching position, he would choose the man.
 
 
 15
 Biver testified that Gundar Strautnieks, the Principal at McArthur High School from 1978 to the time of trial, called her a "lippy, troublemaking broad" for giving an interview to a local newspaper. Strautnieks denied ever making the statement. Biver further testified that the school, and particularly Strautnieks, retaliated against her for filing her various lawsuits.
 
 
 16
 Strautnieks testified that he reprimanded Biver for what he considered to be her unprofessional conduct. For example, on one occasion Biver had a student deliver to Strautnieks a list of students who had passed a particular course. The list was written on the back of a Wendy's restaurant coupon. Biver testified that her relationship with Strautnieks deteriorated after the Wendy's coupon incident.
 
 
 17
 On another occasion, according to Strautnieks, Biver sent to him, via a student, a scrawled, handwritten copy of a final exam Strautnieks wished to see. Biver's conflict with Strautnieks included Biver's classroom conduct. Strautnieks asked Biver to refrain from discussing her applications for coaching positions with her students, but Biver refused to comply with his request.
 
 
 18
 Biver introduced statistical evidence, without contemporaneous objection, that indicated that higher paying administrative positions in the school district were dominated by men, although a majority of the teachers in the district were women. The trial court refused Saginaw Schools' request to introduce other statistical evidence to rebut Biver's statistics. An offer of proof revealed that Saginaw Schools' statistics would show that teachers in the district, most of whom were women, made more money per day worked than administrators. The trial court stated that Saginaw Schools failed to object to Biver's statistical evidence and, since that evidence was irrelevant, he would not allow rebuttal of an irrelevancy.
 
 
 19
 Before resigning in 1976 as coach of the girls' basketball team, Biver told Stelter that she intended to apply for the boys' basketball coaching position when the next vacancy occurred. Biver testified that he told her "it won't do you any good ... because you're a woman and I believe men should coach men's sports and women should coach women's sports."
 
 
 20
 When Biver informally expressed interest in applying for the boys' coaching position in 1978 when the previous coach resigned, Stelter told her to "leave it to our student teacher, he needs the money." The position was filled by a male teacher from a different high school, the only person to apply for the job.
 
 
 21
 Biver formally applied for a coaching position during the spring of 1979, when the boys' varsity basketball coaching position became vacant. Of ten applicants for the position, four were interviewed. Biver was not selected to be interviewed. The hiring committee was composed of Stelter, Hinkin, and Oscar Huyghe, the Principal of McArthur High School. Hinkin testified that Stelter made the decision not to interview Biver, while Stelter testified that it was a decision made by the hiring committee. Hinkin also testified that Superintendent McConnell had to approve the committee's recommendations. He stated that the selection committee gave great weight to Stelter's opinion of each applicant's technical basketball knowledge. In addition, Hinkin testified that he and Oscar Huyghe assigned great weight to Stelter's opinion as to whom should be coach.
 
 
 22
 Richard Bomboske was chosen for the position. He had three years' experience as a high school freshman basketball coach, and two years' experience as a high school assistant varsity coach.
 
 
 23
 Shortly after Bomboske was hired, the coach of the girls' basketball team resigned. Biver testified that she told Hinkin that if she was not hired to fill the vacancy, or at least was not seriously considered for it, or if someone less qualified than she was hired, she would sue. Biver then left the state for summer vacation. She did not file a written request for notification of vacancies as required by her union's collective bargaining contract.
 
 
 24
 While Biver was out of state, Bernard Call was hired to coach the girls' team. Biver testified that the school did not notify her that the position was being filled, and when she confronted Hinkin he said that he had told the union president to call her. Hinkin testified that he could not recall Biver ever expressing an interest in the job, but that he had notified the union of the vacancy. He further stated the job opening was not posted because it was summer vacation and the notice would not have done any good.
 
 
 25
 In 1982, the boys' basketball coaching position again became vacant. Biver applied and was interviewed, as were all the applicants. Prior to the interviews, Biver complained that no women were on the hiring committee. A woman was then appointed to the committee. The committee consisted of Stelter, Hinkin, Strautnieks and Geraldine Pugh, a physical education teacher at a local middle school. Bernard Call, the girls' coach, was hired to coach the boys' team.
 
 
 26
 The girls' and boys' basketball coaching positions again became vacant in 1984, and Biver applied for both positions. The hiring committee consisted of Strautnieks, Stelter, Patricia Murphy, Director of Personnel for Saginaw Township Community Schools, Jack Cleveland, Assistant Superintendent of Schools in charge of curriculum, and Judy Johnson, a physical education teacher at a local middle school. Johnson testified that the committee relied on Stelter for his technical knowledge of basketball, and his evaluation of applicant's responses to technical questions.
 
 
 27
 Biver was not selected for either position. Tim Donahue was chosen for the boys' position, and Dennis Shumaker for the girls' position. Donahue had ten to fifteen years of coaching experience, although none of it was as head coach at the varsity level. Shumaker was chosen for the girls' position even though he did not teach in the Saginaw Township school district, and despite the fact that the school district had a policy of preferring in-district teachers for extra-curricular positions. Shumaker had about eight years' coaching experience, including four years as a high school freshman coach, and four years as a high school junior varsity coach.
 
 
 28
 Saginaw Township Schools articulated a number of reasons for not hiring Biver. The primary reason, it maintained, was that she was never the best qualified person for the job. On each occasion, the hiring decision was based upon subjective factors such as perceived technical basketball knowledge, communication skills, ability to motivate, and moral standards. Appellants offered evidence that Biver was not chosen for the additional reasons that: (1) Her responses to questions in her interviews were inadequate; (2) She was seen smoking in the hallway during half-time of a game during her tenure as coach; (3) She allowed students to use her locker room keys which was an example of inadequate supervision; (4) Her classroom conduct was unprofessional; and (5) She could not get along with Principal Strautnieks.
 
 I.
 
 29
 Appellants' first contention is that the district court improperly denied their alternative motions for new trial or judgment n.o.v.. The standard we apply in reviewing the district court's ruling is that reversal is warranted only if, after viewing the evidence in a light most favorable to the party opposing the motion, we conclude that "the evidence points so strongly in favor of the movant that reasonable minds could not come to a different conclusion...." Morelock v. NCR Corp., 586 F.2d 1096, 1104-05 (6th Cir.1978), cert. denied, 441 U.S. 906 (1979); see also Hill v. Spiegel, Inc., 708 F.2d 233, 237 (6th Cir.1983). Since we conclude that the evidence presented in the appellant's favor was not so overwhelming that reasonable minds could not reach different conclusions whether it supports the verdict rendered, we affirm the district court's denial of the motions for judgment n.o.v. and new trial.
 
 
 30
 The basic principles controlling Title VII actions were established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981):
 
 
 31
 "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.
 
 
 32
 * * *
 
 
 33
 "The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination."
 
 
 34
 Burdine, 450 U.S. at 252-53 (quoting McDonnell Douglas, 411 U.S. at 802, 804) (footnote and citations omitted). It is important to understand that under the McDonnell Douglas/Burdine inquiry, the defendant need only articulate legitimate, nondiscriminatory reasons for not hiring the plaintiff, and "need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254.
 
 
 35
 If the defendant succeeds in rebutting plaintiff's prima facie case, the burden of persuasion remains on the plaintiff:
 
 
 36
 "She must now have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision.
 
 
 37
 "This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence."
 
 
 38
 Burdine, 450 U.S. at 256 (citation omitted). In this regard, this Court recently stated "that the plaintiff need not introduce new evidence regarding pretext. '[T]here may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.' " Henry v. Lennox Industries, Inc., 768 F.2d 746, 751 (6th Cir.1985) (quoting Cooper v. Federal Reserve Bank, 104 S.Ct. 2794, 2799 (1984)).
 
 
 39
 The evidence supports Biver's conclusion that on each occasion on which she failed at selection for a coaching position, Stelter, the Athletic Director at McArthur High School, dominated, or at least heavily influenced, the determination of which candidate was best qualified in terms of technical basketball skills. Stelter, according to his own testimony as well as Biver's, preferred a man coaching boys' teams and a woman coaching girls' teams. Standing alone, that understandable preference would not support a finding of unlawful discrimination. Other evidence indicated, however, that while Stelter did not want women coaching boys' basketball, he would allow men to coach girls' teams and, when just that decision was made in 1979, the school district's superintendent agreed with this position. When that evidence is taken together with the whole record in this case, including Biver's testimony concerning the treatment given her after the settlement of her first lawsuit, Strautnieks' characterization of her as a "lippy troublemaking broad," McConnell's promise that when men and women coaches receive equal pay only men would be hired, and, importantly, appellants refusal to hire Biver for any coaching position while hiring men to coach girls' teams even after Stelter and Hinkin recommended Biver for an outstate college coaching position, we are unable to conclude that no reasonable juror could find that the decision not to hire Biver was made with discriminatory animus, and that the proferred reasons were pretextual.[1]
 
 
 40
 There is no evidence to support appellants' claim that Biver's conflict with Principal Strautnieks was a determining factor in the hiring committee's decision to reject Biver's coaching applications. Strautnieks testified that Biver's unprofessional conduct did not affect his evaluation of her coaching ability. We hold that, on the record before us, reasonable minds could differ whether discriminatory animus was a determining factor in the refusal to hire Biver as basketball coach of either the boys' or the girls' teams, and we affirm the district court's denial of appellants' alternative motions for new trial and j.n.o.v..
 
 II.
 
 41
 Appellants next claim is that, in order to prevail, Biver was required to prove that she was more qualified than the persons selected for the various coaching positions. They urge us to adopt the Fourth Circuit rule that a plaintiff in a Title VII employment discrimination case is required to prove that she was better qualified than the other candidates before the trier of fact could permissibly find that discriminatory reasons more likely motivated the employer. See Anderson v. Bessemer City, 717 F.2d 149 (4th Cir.1983), rev'd on other grounds, 105 S.Ct. 1504 (1985).
 
 
 42
 We decline to adopt the Fourth Circuit rule.
 
 
 43
 The plaintiff's ultimate burden in this case, of course, was to show that she was the victim of intentional discrimination. The McDonnell Douglas framework organizes the evidence and enables the trier of fact to draw inferences about the motivation of the defendant. Creating still another evidentiary burden unnecessarily complicates the issue. Whether the plaintiff is more qualified than those selected for a job is certainly relevant to the defendant's motivation when the defendant contends that its decision was based on another applicant's superior qualifications. The fact that a rejected applicant was "least" qualified does not assure that the employer's motive was not discriminatory; nor does the employer's refusal to hire the "best" qualified applicant necessarily indicate discriminatory intent. Accepting, arguendo, that Biver was less qualified than the successful applicants, the jury could still have permissibly concluded that the defendants' discriminatory intent was the reason for the decision not to hire her. We therefore hold that, while the relative qualifications of the applicants is relevant, a Title VII plaintiff is not required to prove she is "better" qualified than other candidates in order to prevail. We observe in passing that despite having had occasion to consider the matter, the Supreme Court has not held that a Title VII employment discrimination plaintiff must prove she is "better" qualified.[2]
 
 III.
 
 44
 Appellants' third contention is that the trial court committed prejudicial error when it refused to receive appellant's statistical evidence to rebut the statistical evidence presented by Biver. Appellants failed to object when Biver introduced evidence that the higher paying administrative positions in the school district were dominated by men even though a majority of the teachers in the district were women. Appellants later sought to rebut this claim with evidence that teachers earned more per day worked than administrators. The district court concluded that the unobjected to statistical evidence was irrelevant to the issues at trial, and that it would not allow rebuttal of an irrelevancy. The district court said the appellants should have objected to the admission of the evidence.
 
 
 45
 Under Fed.R.Civ.P. 61, we may not reverse the district court judgment for the erroneous exclusion of evidence unless refusal to do so would be "inconsistent with substantial justice." Fed.R.Evid. 103 provides, similarly, that "error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." Even if the statistical evidence was relevant, its probative value was slight. In light of the evidence of intentional discrimination in this case, we think the court's ruling was not inconsistent with substantial justice and had no effect on the verdict. The error, if any, in the district court's exclusion of the appellant's rebuttal evidence was harmless.
 
 IV.
 
 46
 Appellants' fourth contention is that Virginia Johnson's testimony that Saginaw Township School Superintendent McConnell once said that "hell would freeze over before he would hire a woman for a boys' coaching position", was inadmissible hearsay, the admission of which was reversible error. Specifically, appellants argue that this statement was offered to prove the truth of the assertion; that is, to prove that "defendants are disinclined to hire females for their coaching positions." Appellants also argue that since McConnell, the declarant, is not a party opponent, the statement was not an admission and is therefore inadmissible under Fed.R.Evid. 801(d)(2).
 
 
 47
 Appellants' arguments are without merit. In the first place, it is plain that the superintendent's statement, that "hell would freeze over before he would hire a woman for a boys' coaching position," was not offered for the purpose of proving the truth of the assertion about when "hell would freeze over." Rather, the statement was an euphemism allegedly uttered by the superintendent and offered in evidence as proof of his attitude or state of mind relating to the employment of women to coach boys' teams. As such, the statement is circumstantial evidence of a relevant fact, the superintendent's discriminatory intent, and is not inadmissible hearsay because it was not offered for the hearsay purpose of proving its truth. Moreover, even if the statement was offered for its truth, it is nevertheless admissible as an exception to the hearsay rule. Fed.R.Evid. 803(3) provides that a statement, otherwise inadmissible as hearsay is not excluded by the hearsay rule if it is "[a] statement of the declarant's then existing state of mind, [or] emotion ... (such as intent ... motive ... [or] mental feeling ...)." Accordingly, the statement was admissible to show McConnell's discriminatory intent. Moreover, the statement was admissible for the nonhearsay purpose of showing Stelter's and Hinkin's awareness of Superintendent McConnell's attitude toward hiring coaches. Their knowledge of McConnell's preference was relevant, given their relationship to the superintendent and the evidence that the superintendent approved all hiring decisions during his tenure.
 
 
 48
 Finally, Fed.R.Evid. 801(d)(2)(D) provides that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." Appellants contend that McConnell played no role in the selection of coaches, and thus the matter was not within the scope of his agency. However, this assertion is directly controverted by Hinkin's testimony that all recommendations must be approved by the superintendent before they are presented to the school board. In Hill v. Spiegel, Inc., 708 F.2d 233, 237 (6th Cir.1983), we found that statements did not fall within Rule 801(d)(2)(D) where there was no showing that the declarants "had any involvement in the decision to discharge." In this case, Hinkin testified unequivocally that the superintendent approves recommendations for hiring. McConnell's statement was made to board member Johnson at a school board budget meeting and was within the scope of his agency. We hold that the statement was admissible.
 
 V.
 
 49
 Appellant's fifth contention is that the trial court erred in refusing to instruct the jury that it was required to find that Saginaw Township Schools had a duty to notify Biver of an open coaching position in 1979 before liability could be imposed for failure to notify. In 1979, Biver verbally expressed an interest in the girls' basketball coaching position which was soon to be vacant. She then left the state for summer vacation without submitting written notice of her interest in the position as required by her collective bargaining agreement. She was not notified that the position was being filled, and Bernard Call was hired for the job.
 
 
 50
 Appellants contend that they had no duty to notify Biver of any opening that occurred during summer vacation unless she complied with the requirement that request for notification be in writing. The district court disagreed, concluding that the appellants had a duty not to violate Biver's constitutional rights. The court instructed the jury:
 
 
 51
 "It is undisputed that the Plaintiff did not actually apply for the 1979-80 girls' basketball position. You may consider her to have applied for such position on her claim against a particular Defendant only if such Defendant knew that she would be an applicant, and if such Defendant intentionally omitted to notify her because of her sex or in retaliation for having made claims of sex discrimination." (Emphasis added.)
 
 
 52
 In light of the evidence that Biver told Hinkin that if she were not at least considered for the next coaching vacancy she would sue, we conclude that the instruction was not error. Moreover, the jury could find Biver applied for the 1979 vacancy only if it first concluded that appellants failed to notify her because of her sex.
 
 VI.
 
 53
 Appellant's argue that the district court's instruction on the influence of a particular person on the hiring committee was reversible error. The instruction provided:
 
 
 54
 "If the decision was made by a selection panel, it is sufficient if she proves that her sex was a significant adverse factor to a member of the panel who influenced the panel's decision.
 
 
 55
 "If a person was in a dominant position on the panel or with respect to the panel, this fact alone could support a finding that such person influenced the panel."
 
 
 56
 We find no error in this instruction. The evidence indicated that Stelter was opposed to women coaching boy's teams. A jury could conclude, from the evidence, that his technical expertise in basketball was relied on by the other members of the hiring committee. Moreover, Judy Johnson testified that Stelter's evaluation of Biver's technical skills affected her recommendation in 1984, and Hinkin testified that both he and Oscar Huyghe relied on Stelter's evaluation in 1979.
 
 VII.
 
 57
 Appellants assert that the award of $62,000 in compensatory damages to Biver was excessive, since Biver's earnings would have been only $30,000 had she been hired for the coaching positions. The district court judgment was alternatively based on Michigan's Elliott-Larsen Civil Rights Act, Mich.Comp.Laws.Ann. Sec. 37.2101 et seq. Under Michigan law, a verdict is reduced only if it is so excessive as to "shock the judicial conscience." Stevens v. Edward C. Levy Co., 376 Mich. 1, 5; 135 N.W.2d 414 (1965). The trial court stated:
 
 
 58
 "[I]t is not intended that the compensation provisions to be included in the Judgment will relate directly to lost income. Her real injury is the lost opportunity to pursue coaching varsity basketball, including the delayed opportunity to develop and demonstrate her skills as a varsity basketball coach, because she is a woman."
 
 
 59
 Considering the opportunities Biver lost, we cannot conclude that the verdict is shocking to the conscience.
 
 VIII.
 
 60
 Appellants contend that the evidence does not support an award of punitive damages. In Smith v. Wade, 461 U.S. 30, 56 (1983), the Supreme Court stated: "a jury may be permitted to assess punitive damages in an action under Sec. 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." While there was no evidence to support a conclusion that appellant's acted with "evil motive or intent," a jury question was presented as to the "reckless or callous indifference" of Stelter and Hinkin with respect to Biver's right to be free of discrimination on the basis of sex. Cf. Burkhart v. Randles, 764 F.2d 1196, 1201-02 (6th Cir.1985). Therefore, we hold no error occurred in allowing jury consideration of the punitive damage issue.
 
 IX.
 
 61
 Appellants final argument is that the district court erred in ordering Biver appointed to the next available head coach position of both girls' and boys' varsity basketball, because employment decisions are within the employer's discretion, and it is possible that candidates who are better qualified than Biver will apply. We have stated that:
 
 
 62
 "The scope of the remedy [under Title VII] rests within the sound discretion of the district court. A finding of intentional discrimination presumptively entitled the plaintiff to reinstatement. '[R]einstatement, like backpay, should be denied "only for reasons which, if applied generally, would not frustrate the central statutory purpose of eradicating discrimination...." ' Reinstatement has been found inappropriate where the plaintiff has found other work or could have, where reinstatement would require displacement of a non-culpable employee or where hostility would result."
 
 
 63
 Henry v. Lennox Industries, Inc. at 752-53 (citations omitted) (quoting Grubb v. W.A. Foote Memorial Hospital, Inc., 533 F.Supp. 671, 676 (E.D.Mich.1981)).
 
 
 64
 There is no evidence that the remedy ordered by the district court is inappropriate. Biver pursued other coaching opportunities despite appellants' illegal conduct. That conduct left Biver without current coaching experience, and has probably diminshed her chances of securing other positions. The district court's order of appointment at the next vacancy does not displace a currently employed non-culpable employee. There is no evidence of hostility toward Biver by the students or other teachers and coaches. According, the district court's order of equitable relief was proper.
 
 
 65
 For all of the foregoing reasons, the judgment of the district court is affirmed.
 
 
 66
 CONTIE, Senior Circuit Judge*, concurring in part and dissenting in part.
 
 
 67
 I concur in all aspects of the majority's opinion except part VIII, in which the majority affirms the award of punitive damages. As the majority correctly observes, the Supreme Court in Smith v. Wade, 461 U.S. 30 (1983), set forth the standard for awarding punitive damages in a Sec. 1983 action. Pursuant to Wade, a jury may assess punitive damages if the defendant's conduct is "motivated by evil motive or intent" or if "it involves reckless or callous indifference" to the plaintiff's rights. Id. at 51, 56. The majority holds, and I fully agree, that there was no evidence showing "evil motive or intent." I disagree, however, with the majority's ensuing conclusion that "a jury question was presented as to the 'reckless or callous indifference' of Stelter and Hinkin." I believe there was insufficient evidence that the conduct of Stelter and Hinkin was of the high degree of negligence represented by the "reckless or callous indifference" standard. Consequently, I believe there was insufficient evidence to support the award of punitive damages.
 
 
 68
 Punitive damages may be awarded only if the conduct upon which they are based is of such a serious nature that it calls for an award beyond that provided by a normal compensatory award. Wade, 461 U.S. at 54. Only when an award of punitive damages is based on such serious conduct is it consistent with its purposes of punishment for engaging in outrageous conduct and deterrence from engaging in future similar conduct. Id. In my opinion, the evidence in this case does not establish the type of outrageous conduct which calls for punishment and deterrence beyond that provided by a recovery of compensatory damages. Accordingly, I would reverse the award of punitive damages on the ground that it is not based on conduct involving reckless or callous indifference to Biver's rights and therefore is inconsistent with the purposes of punitive damages.
 
 
 
 [1]
 Despite the strong feeling apparently expressed within the school that a female should not coach men and boys' basketball, we note that there was no effort to raise in the pleadings or proof at the district court level or among the issues before us in this appeal any claim that the requirement of a male coach for a men's or boys' basketball team was a bona fide occupational qualification reasonably necessary to the normal operation of that sport within the meaning of 42 U.S.C. Sec. 200e-2
 
 
 [2]
 Compare International Brotherhood of Teamsters v. United States, 431 U.S. 324, 358 n. 44 (1977) (McDonnell Douglas requires a Title VII plaintiff to demonstrate her rejection was not the result of "an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.") with Mitchell v. Baldrige, 759 F.2d 80, 85 (D.C.Cir.1985) ("We read the somewhat delphic Teamsters footnote as contemplating qualifications relative to the entire pool from which applications are welcome, rather than qualifications relative only to those eventually selected.") (Emphasis in original.)
 
 
 *
 Judge Contie took senior status on July 1, 1986