**CONSOLIDATED PIPE & SUPPLY CO., INC., Plaintiff,**

v.

**ROVANCO CORP., Defendant.**

No. 94 C 6688.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 31, 1995.

Thomas E. Woodrow, Burke, Weaver & Prell, Chicago, IL, for plaintiff.

Christopher Horvay, Holleb & Coff, Chicago, IL, for defendant.

R. Scott Alsterda, Coffield Ungaretti & Harris, Chicago, IL, for assignee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, Senior District Judge.

This Court has conducted an evidentiary hearing (the "Hearing") in connection with the motions for the entry of turnover orders and citations to discover assets that Consolidated Pipe & Supply Co., Inc. ("Consolidated"), a judgment creditor of Rovanco Corp. ("Old Rovanco"), has launched against two targets: Rovanco Piping Systems, Inc. f/k/a Rovanco Acquisition Corporation ("New Rovanco") and John Kolleng ("Kolleng") as assignee for the benefit of creditors of Old Rovanco ("Assignee").[1] Each side has tendered proposed findings of fact ("Findings") and conclusions of law ("Conclusions"), and this Court hereby issues its Findings and Conclusions in accordance with Fed.R.Civ.P. ("Rule") 52(a). To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both those respects, see *Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

### Findings of Fact

1. Old Rovanco is a Delaware corporation whose principal place of business was in Joliet, Illinois. Its business consisted of the manufacture of piping systems and the sale of factory-fabricated and engineered piping systems on a wholesale basis.

2. In the early 1980s Eugene Cashman ("Cashman") became Old Rovanco's majority shareholder, owning 51% of its stock until 1992. At some point in time Cashman loaned approximately $300,000 to Old Rovanco, and in conjunction with that infusion of capital his stock interest increased to approximately 78%. Throughout the period of his ownership the remaining stock of Old Rovanco was owned by Lawrence Stonitsch ("Stonitsch") and his brother Richard in equal shares. Stonitsch, who had originally founded Old Rovanco in 1970, was its President and Chief Operating Officer, with Cashman serving as Chairman of its Board of Directors ("Board"). Except for Stonitsch and his brother Richard (who was also Old Rovanco's Vice President), all of the other Board members were Cashman designees.

3. Richard Vetter ("Vetter") is an officer of several businesses owned by Cashman. About 1980 Vetter was placed on Old Rovanco's Board to serve, as he testified, as a "representative of Mr. Cashman's interests." In 1991 Vetter brought Charles Ray ("Ray") into Old Rovanco to provide additional management and to have a direct line into corporate affairs on behalf of Cashman. Ray became both the Chief Executive Officer and a Board member of Old Rovanco.

4. From about 1989 through virtually all of 1994 Old Rovanco experienced substantial operating losses, although its performance had improved significantly from the time that Ray had been brought into corporate management until the end of 1993. For the first three months of 1994, however, Old Rovanco's reported loss was approximately $750,-000.

5. Because of the ongoing operating losses referred to in Finding 4, Old Rovanco's Board decided that the company should be sold.[2] Its short-term attempts to sell the

---

1. Both Assignee and his colleague Michael Eber ("Eber") are employed by, and some of the documentation in this proceeding (for example, one of Consolidated's citations) is directed to, Development Specialists, Inc. ("Development"). However, none of the exhibits presented during the Hearing reflect any change in the identity of the assignee from Kolleng to Development, nor to this Court's knowledge has any testimony during the Hearing spoken to that subject. If in fact Development has become the successor assignee under the Assignment via some document not tendered to this Court, these Findings and Conclusions of course will apply with equal force to Development as Assignee.

2. These Findings will refer to selling the "company," not as a term of art denoting the form of any disposition in any technical sense—whether by sale of all the assets, sale of substantially all the assets, sale by shareholders of all of the stock or of a controlling stock interest, or what have you—but rather in the colloquial sense of divesting the prior ownership of the business in favor of a purchasing entity, instead of terminating all business operations and liquidating the assets.

company as a going concern were unsuccessful (see, e.g., Finding 9). Then on July 28, 1994 Old Rovanco entered into an Exclusive Agency Agreement (the "Innisbrook Agreement") with Innisbrook Equity Group, Limited ("Innisbrook") under which Innisbrook agreed to act as Old Rovanco's exclusive agent to market and sell all of its assets and property (collectively the "Assets").

6. Innisbrook's President Jacques Hopkins ("Hopkins") formed Innisbrook in 1991 to act as a "merger and acquisition intermediar[y] for troubled and bankrupt companies." Innisbrook's practice is to market a company quickly in an effort to solicit purchase bids by a short deadline. Normally Hopkins implements a marketing schedule for the transaction lasting 90 to 120 days.

7. In this instance Hopkins analyzed Old Rovanco's operations and prepared an evaluation, concluding that the company could be sold for $4.5 million. Innisbrook and Old Rovanco then entered into the July 28 Innisbrook Agreement, establishing a 60–day deadline (to September 28, 1994) for parties to bid on Old Rovanco.

8. Hopkins promptly began efforts to market the Assets on a national basis, attempting to flood the potential market through newspaper ads and a mass mailing to possible purchasers. For that purpose Hopkins prepared a two-page direct mail flier with information relating to Old Rovanco's business operations and initially distributed about 6,600 pieces of the direct mail flier, then remailed some 2,800 pieces to individuals and entities associated with the piping industry. Once Hopkins identified someone as a potentially serious buyer, he provided that prospect with detailed information about the company and its financial status. Hopkins also scheduled plant inspections and encouraged potential buyers to submit a bid by the September 28 deadline.

9. Meanwhile, in July 1994 Stonitsch and co-investor Dale Sobeck ("Sobeck") had attempted to work out an arrangement to purchase Cashman's stock in Old Rovanco. Stonitsch wanted to continue operating the

business, and he intended to control the company and negotiate with vendors for a reduction in payables in an effort to do so. It was after rejecting the Stonitsch–Sobeck letter offer that Board decided to put Old Rovanco up for public sale.

10. To return to Innisbrook's mailing, it specified a sealed bid deadline of September 28, 1994 for offers to purchase Old Rovanco's assets. Only a few offers were received before that date. Taconic Capital (acting through Tom Wippman, and with Stonitsch as a proposed coinvestor) submitted a written proposal to purchase the Assets as a going concern, but later withdrew that proposal because of Taconic's inability to obtain the requisite financing. Camellott Corporation (acting through Dan Songger) submitted a going-concern bid of $3 million, but it was ultimately rejected by Old Rovanco. MFRI (acting through David Unger) also submitted a bid that was ultimately rejected by Old Rovanco.

11. On November 4, 1994 Stonitsch, acting for himself or his designee referred to as "Newco,"[3] submitted a letter of intent ("Newco Purchase Offer") for the purchase of the Assets as a going concern. In material part the Newco Purchase Offer provided that Newco was to acquire the Assets free and clear of all liens and encumbrances from an assignee for the benefit of creditors to whom the Offer required the Assets to be transferred by Old Rovanco, with the purchase price for the Assets being the sum of (a) $450,000 plus (b) the amount of Old Rovanco's secured indebtedness to American National Bank and Trust Company of Chicago ("Bank"). Old Rovanco immediately accepted the Newco Purchase Offer.

12. On November 21, 1994 Old Rovanco made the assignment for the benefit of its creditors that was required by the Newco Purchase Offer by executing a Trust Agreement and Assignment for the Benefit of Creditors ("Assignment"), appointing Kolleng as Assignee and assigning the Assets to him as Assignee. Under a contemporaneous-

---

**3.** Though Stonitsch's bid did not identify his associates, Sobeck had again joined with him in the proposed acquisition.

ly executed Addendum to the Assignment, Assignee approved, assumed and agreed to be bound by the terms and conditions of the Innisbrook Agreement as well as the Newco Purchase Offer, with the latter being made "subject to [Assignee's] duties under law to solicit higher and better offers."

13. Assignee then notified Old Rovanco's creditors of the Assignment by letter dated November 23, 1994. In addition to notifying the creditors in general terms that "certain members of the ROVANCO management team have expressed an interest in purchasing the assets," the letter said that "all interested purchasers will be invited to submit an offer" to Assignee at a public sale to be held two weeks later. Then the letter requested that each creditor execute and return to the Assignee within six months an Affidavit of Claim and Consent to Assignment Form, indicating the amount of the creditor's claim against Old Rovanco. Next Assignee scheduled a public sale of the Assets to be held on December 6, 1994 and published notices of the public sale in the *Chicago Tribune* on November 27 and December 4, 1994.

14. Consolidated is an Alabama corporation with its principal place of business in Birmingham, Alabama. It manufactures and sells various types and configurations of pipe and pipe products. From approximately June 1, 1992 through September 30, 1994 Consolidated had sold and delivered pipe and coating to Old Rovanco on account, regularly sending invoices covering the unpaid amounts. Because of the large aggregate unpaid balance of those invoices, on November 8, 1994 Consolidated filed a complaint against Old Rovanco for breach of contract. Old Rovanco did not file an answer, and on November 29 Consolidated filed a motion for default judgment against Old Rovanco. On December 5 this Court entered a default judgment against Old Rovanco in the amount of $110,112,88 plus court costs.

15. In the meantime counsel for Consolidated and two other creditors of Old Rovanco had requested that Assignee delay the public sale to permit them to conduct an investigation and assessment of the situation and to determine whether they wished to pursue filing an involuntary bankruptcy petition against Old Rovanco. In accordance with their request, Assignee continued the public sale to December 12, 1994, publishing notice of the date of the continued sale in the *Chicago Tribune* on December 11.

16. On or about December 9, 1994 Assignee was advised by counsel for the three creditors that they had decided not to proceed with filing an involuntary bankruptcy petition against Old Rovanco. On December 12 Assignee's sale of the Assets was conducted and concluded. There were no bidders present at the sale other than Stonitsch on behalf of Newco, which reaffirmed its bid to purchase the Assets on the terms and subject to the conditions contained in the Newco Purchase Offer. No other bids were received at the public auction sale, and Assignee accepted the Newco Purchase Offer with certain waivers of various contingencies by Newco.

17. Between the November 21 date of the Assignment and the January 11, 1995 closing of the transaction with Newco (the "Closing"), Assignee continued to operate Old Rovanco's business with the use of the Assets but at about half of the business' normal level. Eber was at Old Rovanco's place of business as Assignee's agent on a daily basis during the period between the date of the Assignment and the Closing, and during that period he had control over all aspects of the company. Then at the Closing Assignee delivered to New Rovanco (the entity previously known as "Newco") Assignee's Bill of Sale transferring to New Rovanco all of Assignee's right, title and interest in and to the Assets.

18. At the Closing the proceeds of sale of the Assets totaled $1,458,703.63. Bank, which was Old Rovanco's primary secured creditor, received $1,008,703.63 of that amount in payment of the entire amount of indebtedness owed to it. In exchange Bank delivered to Assignee a UCC–3 termination statement releasing its lien on and its security interest in the Assets. Another $325,000 was paid out of the proceeds to Cashman, who was the holder of $375,000 in Old Rovanco's subordinated secured debt (Cashman agreed to accept $325,000 in full satisfaction of that secured claim). In exchange Cash-

man delivered to Assignee an executed UCC–3 termination statement terminating Cashman's lien on and security interest in the Assets. After the Closing Assignee paid Innisbrook the sum of $9,520.38 (that was 50% of the amount that was provided for in the Innisbrook Agreement, with Cashman paying the remaining $9,520.37 pursuant to his agreement with Assignee).[4] All remaining proceeds of sale have been held by Assignee for the benefit of Old Rovanco's creditors in accordance with the Assignment, except that:

> (a) Because Assignee assumed the Innisbrook Agreement and then paid half of Innisbrook's charges, Innisbrook was given priority over all other unsecured creditors.

> (b) Assignee has also treated himself as a priority claimant. As of March 31, 1995 he or his company had billed approximately $40,000 for services associated with the Assignment.

19. Ever since the Closing New Rovanco (now doing business under the name of Rovanco Piping Systems, Inc.) has engaged in the manufacture of the same products as Old Rovanco, utilizing the same manufacturing equipment and facilities in Joliet that were used by Old Rovanco, employing many of Old Rovanco's former employees and seeking business from the same customers as Old Rovanco. Among the Assets transferred to New Rovanco at the Closing were Old Rovanco's receivables, totaling about $1.5 million. Most of Old Rovanco's creditors had refused to pay the company while the Assignment was pending, but as of the time of the Hearing almost 80% of the receivables had been collected and kept by New Rovanco.

20. On December 12, 1994 Consolidated notified Assignee of the amount of its claim against Old Rovanco. Consolidated stated in the claim form provided by Assignee that it reserved the right to pursue its legal remedies in collecting the debt.

21. On December 20 Consolidated served Assignee with a Citation To Discover Assets. Consolidated also served a copy of the Citation, a Notice of Citation and a copy of the underlying judgment on Old Rovanco as required by Illinois law (735 ILCS 5/2–1402). It was while the December 20 citation was pending, and while Consolidated was engaged in the discovery of assets in Assignee's possession, that Assignee (without any notification to this Court or to Consolidated) transferred ownership and possession of the Assets to New Rovanco and received the proceeds and made the payments referred to in Finding 18.

22. On January 17, 1995 Consolidated filed a motion for entry of a turnover order against Assignee, requesting that to satisfy Consolidated's judgment this Court order Assignee to turn over all property and assets of Old Rovanco that Assignee possessed as assignee from Old Rovanco. Then on February 1, after learning of the January 11 transfer of Assets from Assignee to New Rovanco, Consolidated filed a motion for entry of a turnover order against New Rovanco and also served it with a Citation To Discover Assets.

23. As of the time of the Hearing $1.3 million in claims had been submitted to Assignee by creditors of Old Rovanco. At that time slightly more than $89,000 remained in the account at Bank being held for potential distribution to Old Rovanco's remaining creditors (including Consolidated). There are no other funds available to pay off those remaining creditors. Eber estimates that the unsecured creditors of Old Rovanco, including Consolidated, will receive five cents on the dollar in partial payment of their claims against Old Rovanco. It appears, however, that the amounts ultimately payable toward those claims will be less than that.

*Conclusions of Law*

1. This Court has jurisdiction over the underlying action by Consolidated against Old Rovanco on the ground of diversity of citizenship between those parties under 28 U.S.C. §§ 1332(a)(1) and (c)(1) (see Findings 1 and 14). Under Rule 69(a) Consolidated's efforts to collect on its judgment are re-

---

4. As Finding 12 reflects, the obligation to Innisbrook had initially been incurred by Old Rovanco but was then assumed by Assignee.

quired to be carried out in accordance with Illinois law.

■ 2. Consolidated's December 20, 1994 Citation To Discover Assets served on Assignee created a lien in the amount of Consolidated's judgment upon any assets in Assignee's possession that constituted property of Old Rovanco (see 735 ILCS 5/2–1402(m); *Appeal of Swartz*, 18 F.3d 413, 416 (7th Cir.1994)).

■ 3. This Court has jurisdiction over the issue of the validity of the attempted assignment of Old Rovanco's assets to Assignee and may therefore enter an order allowing Consolidated to reach any property, assets or funds in the possession of the citation respondents upon a finding that the assignment is invalid (see 735 ILCS 5/2–1402(c)(3); *Illinois Bell Tel. Co. v. Wolf Furniture House, Inc.*, 157 Ill.App.3d 190, 194, 109 Ill.Dec. 277, 280–81, 509 N.E.2d 1289, 1292–93 (1st Dist.1987); *FDIC v. Juron*, 713 F.Supp. 1116, 1122 (N.D.Ill.1989); cf. *RTC v. Ruggiero*, 994 F.2d 1221, 1226–27 (7th Cir. 1993) (affirming this Court's decision (1) granting a petition to impose a resulting trust and (2) ordering property turned over to the judgment creditor)).

■ 4. Under Illinois law an assignment for the benefit of creditors is "a voluntary transfer by a debtor of his property to an assignee in trust for the purpose of applying the property or proceeds thereof to the payment of his debts" (*Illinois Bell*, 157 Ill. App.3d at 194, 109 Ill.Dec. at 280, 509 N.E.2d at 1292). Such an assignment for the benefit of creditors is invalid and unenforceable against nonparticipating creditors if it forces a creditor to accept a pro rata share of the amount owed in settlement of its claim, or if it otherwise contains conditions "onerous" to creditors. As stated in *Gessler v. Myco Co.*, 29 Ill.App.2d 227, 229, 172 N.E.2d 503, 504 (2d Dist.1961), quoting *Tribune Co. v. Canger Floral Co.*, 312 Ill.App. 149, 157, 37 N.E.2d 906, 909 (1st Dist.1941):

One condition which will render an assignment invalid is when it puts creditors to a choice of taking a fraction of their claims in settlement of the whole.... "Thus assignments purportedly for the benefit of

creditors, which place such creditors upon the choice of taking nothing at all or a fraction of their claims in settlement of the whole, are invalid as to non-consenting creditors."

Accord, *Juron*, 713 F.Supp. at 1122.

■ 5. It is not necessary that express coercion of creditors take place to invalidate an assignment for the benefit of creditors, for "an indirect coercion of creditors into releasing their claims for less than their full debt" will also invalidate such assignments (*Illinois Bell*, 157 Ill.App.3d at 197, 109 Ill.Dec. at 281, 509 N.E.2d at 1293, citing *Tribune Co. v. R. & J. Furniture Sales, Inc.*, 20 Ill.App.2d 370, 155 N.E.2d 844 (1st Dist.1959)). In the latter case it was held that an "assignment which gives the assignee the power both to compromise creditors' claims and to prefer creditors is void, because it is an attempt to indirectly coerce creditors into release of their claims for less than their full debt" (*id.* at 373, 155 N.E.2d at 846; accord, *Tribune v. Canger Floral*, quoted in Conclusion 4).

■ 6. Absent some defect of the nature referred to in Conclusions 4 and 5, an assignment for the benefit of creditors passes legal and equitable title to the assignor-debtor's property absolutely from the assignor-debtor to the assignee (*Juron*, 713 F.Supp. at 1119–20). In such event the assignment is valid without the consent of any of the assignor's creditors (*Gessler*, 29 Ill.App.2d at 229, 172 N.E.2d at 504). And *Gessler, id.* at 233, 172 N.E.2d at 506 has at least impliedly rejected the notion that the element of coercion is inherently present simply because the assignor is a corporation with no prospect of acquiring post-assignment property, so that the existing creditors would be faced with the prohibited Hobson's choice.

■ 7. Once a valid assignment for the benefit of creditors has been made, a judgment creditor of the assignor-debtor cannot reach property of the assignor-debtor now held by the assignee (*Bach v. Chas. Weiner & Sons, Inc.*, 6 Ill.App.2d 284, 127 N.E.2d 279 (1st Dist.1955)). Accordingly, if the Assignment in this instance was valid, neither Assignee nor New Rovanco as Assignee's transferee can be compelled to turn over to

Consolidated any portion of the proceeds of the Assets.

8. In this instance the Assignment documentation tracked the literal requirements of Illinois law as reflected in the reported cases, avoiding both direct and indirect coercion of the types that the cases have found to invalidate assignments for the benefit of creditors. There are to be sure some disturbing aspects of the Assignment, although it appears that assignments of the nature involved in this case may well have become a way of life in the practice that utilizes such assignments as an alternative to bankruptcy filing.[5] These aspects of the matter give pause:

(a) Any offer to purchase the going-concern assets of a troubled company that conditions the purchase on the company's making an assignment for the benefit of creditors after the offer has already been accepted but before the sale transaction is closed, in order that the assignee can serve as a buffer insulating against the claims of the original company's general creditors, can surely be viewed as questionable.[6] Such an arrangement is conceptually different from the traditional origins of such assignments as a comparatively inexpensive and convenient means for the liquidation of an insolvent company's assets, to be followed by the pro rata distribution to its general creditors (after giving effect to the priority of any secured creditors).

(b) Assignee's extremely short timetable for the publication of notice and the conduct of the public sale, although it might perhaps have complied with the concept of a commercially reasonable sale as to specific assets (as for example under the UCC), appears potentially questionable as to the sale of a major going concern. Viewed alone, it could scarcely be found to satisfy Assignee's contractual undertaking in the Addendum to Assignment, under which Assignee agreed to be bound by the purchase agreement between Old Rovanco and Stonitsch on Newco's behalf "subject to [Assignee's] duties under law to solicit higher and better offers." It is only in the context of Innisbrook's *earlier* wide-scale efforts to evoke interest in the purchase of Old Rovanco that the entire transactional sequence can fairly be viewed as nonproblematic in that respect.

If the sale to New Rovanco had not involved a bona fide change of control and ownership, such troublesome factors (particularly if they were coupled with the utilization of the assignment device as a means to defeat creditors' claims against the ongoing owners) could have required invalidation of the Assignment here. But on the evidence at the Hearing, Stonitsch and his present group must be viewed as bona fide purchasers of the Old Rovanco business through the pur-

---

5. What took place here, however, is a material extension of the reorganization scenario that is depicted in Melanie Cohen & Joanna Challacombe, *Assignment for Benefit of Creditors—a Contemporary Alternative for Corporations*, 2 DePaul Bus.L.J. 269, 279–81 (1990).

6. It will be remembered that in this instance Board had already *accepted* the Newco Purchase Offer *before* the Assignment was made, in contrast to the situation described by Cohen & Challacombe (see n. 5). Board's acceptance did not contain an express reservation of the right to take a better offer if it came along, but Assignee's assumption of the Newco Purchase Offer acknowledged "his duties under law to solicit higher and better offers." That would appear to render critical the bona fides of any post-acceptance efforts to obtain the best possible price for the Assets, rather than Board's (and Assignee's) simply being content to close the sale to Newco. And in that respect it should be recognized that before majority stockholder Cashman could derive any benefit from the sale beyond the pay-

ment of his secured debt, which was assured by the Newco sale—that is, before Cashman could realize anything qua stockholder—the total sale proceeds would have had to be in the $2.6 million-plus range (enough to pay Bank's $1 million loan, plus Cashman's loan of more than $300,-000, plus the general creditors' $1.3 million, and then to generate some yield for the stockholders over and above those payments). Although it is true that the bird in hand (Newco's purchase price) fell far short of that figure, the record before this Court does not support a conclusion that the Cashman-led forces were simply going through the motions in requiring Assignee to advertise and hold a public sale. To be sure, Hopkins' original $4.5 million ballpark figure (which was generated when he was a pitchman selling his services) had been shown to be hopelessly unrealistic within a short time after he came up with it, but the later Camellott bid had been at the $3 million level, and the record does not disclose the reasons that it was rejected (so that this Court has no basis for assuming it to have been merely pie in the sky).

chase of its Assets, because Cashman as the formerly dominant majority stockholder (as well as a secured creditor) has been eliminated from the picture entirely.

 9. It should also be added that this Court, sitting as it does in diversity, really has less flexibility in stretching the boundaries of state law than would its trial court counterpart in the state court system. As *Gust K. Newberg Const. Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir.1987) has put it:

> A federal court sitting in diversity is particularly ill suited to such a task [considering "a substantial expansion" of the "existing relevant precedents" as decided by the state courts]. *See Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1370 (7th Cir.1985); *cf. Grubb v. W.A. Foote Memorial Hospital, Inc.*, 741 F.2d 1486, 1500 (6th Cir.1984) (Respect for state courts as the primary expositors of state law counsels restraint by federal court in announcing new state law principles, a factor appropriately considered by the district court in declining, in its discretion to hear a pendent state law claim.), *vacated on other grounds,* 759 F.2d 546 (6th Cir.1985), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 289 (1985).

Accord, such cases as *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir.1987) (per curiam) and *Nelson v. Monroe Regional Med. Ctr.*, 925 F.2d 1555, 1561 (7th Cir.1991), citing and quoting *Shaw.* If a state trial court rather than this Court were confronted with the present problem, and if it were inclined to expand the grounds for invalidating an assignment for the benefit of creditors beyond what has been recognized in the existing Illinois appellate precedents, that trial court might do so secure in the knowledge that any error that it might commit in that respect was readily capable of correction on appeal to the very courts that declare Illinois law. But this Court (unlike our Court of Appeals) lacks the power to certify a state law question to the Illinois Supreme Court for its possible discretionary grant of such certification, and so this Court has no warrant to go well beyond the existing frontiers of Illinois law. In sum, Consolidated's argu-

ments for invalidation are simply not strong enough to justify a major extension of the reach of the existing Illinois cases in that respect.

\* \* \*

Because this Court must view the Assignment as a valid common law assignment for the benefit of creditors and therefore as effective with respect to all of Old Rovanco's creditors, including Consolidated, no part of the Assets of Old Rovanco is reachable through Consolidated's post-judgment proceedings. Accordingly Consolidated's motions for the entry of turnover orders are denied and its citations to discover assets are dismissed.